In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-3961, 08-3966, 08-3967, 08-3981, 08-3988,
08-3989, 08-3990, 10-1043, 10-1045, 10-1046,
10-1049, 10-1056, 10-1058 & 10-1059

JOHN W. COSTELLO, not individually,
but as Litigation Trustee Under the
Comdisco Litigation Trust,

*Plaintiff-Appellee*,

*v.*

STEVEN R. GRUNDON, et al.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:05-cv-727, -736, -740, -746,
-763, -764, -767—**Robert W. Gettleman**, *Judge*.

ARGUED APRIL 6, 2010—DECIDED JUNE 28, 2011

Before KANNE, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This consolidated case comes to
us on appeals from the district court's grants of summary
judgment in favor of the plaintiff-appellee, John W.
Costello, Litigation Trustee under the Comdisco Litigation

Trust, and against defendants-appellants in an action to enforce certain promissory notes. We originally issued an opinion on October 18, 2010, affirming in part and vacating in part. Defendants-appellants filed a petition for panel rehearing, and we requested an answer, which was filed. By separate order we granted the petition and vacated the October 18, 2010 opinion and final judgment. For the reasons that follow, we vacate the grants of summary judgment in favor of the Trustee and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

The defendants-appellants (the "Borrowers") are former high-level employees of Comdisco Inc., who participated in Comdisco's shared investment plan (SIP) program ("SIP Program") offered in early 1998 by purchasing shares of Comdisco stock. One hundred percent of the stock purchase price was funded by personal loans from participating banks ("Lenders") represented by First National Bank of Chicago (later Bank One) as their agent (the "Bank"). To secure the loans, the Borrowers executed promissory notes ("SIP Notes" or "Notes") in their personal capacities. Comdisco chose to deal with Bank One because of the bank's experience in developing and implementing SIPs for other companies.

Comdisco guaranteed the loans as provided in a Facility and Guaranty Agreement between Comdisco and the Bank (the "Facility Agreement"). The Comdisco guaranty was "a condition to the loan arrangement" with the Bank. (SA:244.) Comdisco received the loan proceeds

directly from the Lenders and held the SIP shares. It seems probable that without the guaranty, most of the loans would not have been made. SIP participants were required to purchase a minimum of 8,000 shares of Comdisco stock. At $34.50 per share, that resulted in a minimum purchase price and loan of $276,000. The loans' principal amounts ranged from $276,000 to $1,725,000. Loans were made in excess of $1,000,000 to one borrower (05-737) who reported no net worth to the Bank, to another borrower (05-745) for almost ten times his net worth, and to two other borrowers (05-735 & 05-726) for more than five times their net worths.

Comdisco introduced the SIP Program to prospective participants during a weekend meeting in Palm Springs, California. Prospective participants had to attend the meeting or listen to the presentation. The Borrowers received a binder of materials explaining the terms of the SIP Program (the "SIP Materials"). The SIP presentation and SIP Materials informed the prospective participants of various restrictions on their ability to sell the SIP shares and that they would be obligated for a specified time period to share any gains on the sale of the shares with Comdisco. More specifically, they were informed of restrictions including (a) Comdisco would hold a borrower's shares until the borrower's loan from Bank One was discharged; (b) the borrower had to deliver to Comdisco a stock power, endorsed in blank, concerning his or her shares (a blank stock power is generally required when an institution holds securities as collateral for a loan so the institution may transfer and sell the stock to satisfy the debt); (c) the borrower

had to execute an irrevocable Letter of Direction with Comdisco and the Bank to ensure that all cash dividends on the shares went into the borrower's account at Bank One to pay the principal and accrued interest on the loan; (d) the proceeds from a permitted sale of the stock had to "first be used to repay the Loan," interest and fees at Bank One; (e) the borrower paid a prepayment penalty to Bank One if the loan was paid early; and (f) the certificate representing the borrower's shares contained a legend as to the stock's restricted status. The SIP Program was structured so that, with a few exceptions, the SIP shares could not be sold during the first year of the program. An "[SIP Participant was] entitled to 100% of the gain, after payment of all amounts due on the loan, unless [the Participant] voluntarily terminate[d] [his] employment or [sold] the shares within three (3) years after purchase. In either event, the Company [was] entitled to 50% of any gain upon sale." (SA:207.) The SIP participants were required to notify Comdisco of any intention to sell their SIP shares because Comdisco had the right to repurchase the SIP shares. The SIP Materials indicated that the promissory notes to be executed in connection with the loans had a fixed maturity date and a final balloon payment of principal and interest due at maturity. The materials also indicated that Comdisco would guarantee the SIP Notes.

The SIP Materials stated that "the Loan is not secured by the stock" (SA:226) and the "SIP shares do not serve as collateral for the loan . . .[;] the loan is not a margin loan." (SA:229.) When presenting the SIP Plan, Comdisco advised prospective participants that the "loan is not

technically secured by the securities . . . and this is not a margin account." (SA:355.) During the SIP presentation, however, Comdisco was asked, "[C]an th[e] shares be used as security for other transactions or collateral for other type[s] of loans?" A Comdisco representative answered:

> No, and the reason being is they are restricted from the standpoint that the company has certain rights with respect to that stock, depending upon your employment. And also there's restrictions under the terms of the bank loan that you have that there are certain things that will happen with the proceeds to the extent that you sell it before the bank loan is paid off.
>
> So while it is not technically a secured loan, the company retains the stock physically and you cannot pledge that for other loans.

(SA:365.) In addition, the language of the Notes reflected that the stock was "Restricted Stock" and the Facility Agreement, which was incorporated into the terms of the Notes, likewise referred to the SIP shares as "Restricted Stock."

Comdisco provided prospective SIP participants with information regarding whether (a) the proposed loans were margin loans; (b) the proposed loans were secured by the stock; (c) the stock could be pledged for another loan; (d) the proposed loans would violate or be inconsistent with Regulation G or Regulation U; and (e) Comdisco's performance of its obligations under each Loan Document (including the Facility Agreement, each

Note, and each Letter of Direction), to which it was a party would violate any applicable legal requirement. The SIP Materials included Comdisco, Inc.'s 1998 Stock Option Program, which stated in a section titled, "No Illegal Transactions":

> The Program and all Stock Options granted pursuant to it are subject to all laws and regulations of any governmental authority which may be applicable thereto; and notwithstanding any provision of the Program or any Stock Options, Participants shall not be entitled to exercise Stock Options or receive the benefits thereof and the Company shall not be obligated to deliver any Common Stock or pay any benefits to a Participant if such exercise, delivery, or payment of benefits would constitute a violation by the Participant or the Company of any provision of any such law or regulation.

(SA:237-38.)

The SIP Materials described the Facility Agreement as "the agreement between Comdisco and [Bank One] establishing the loan program" and stated that "[b]y signing the Note, you . . . represent that you have carefully reviewed the Facility Agreement." (SA:225.) In the Facility Agreement, Comdisco represented and warranted that "[t]he execution and delivery of, and performance by the Company of its obligations under, each Loan Document to which it is a party will not result in a breach or violation of [or] conflict with . . . any Requirement of Law," (SA:283), which included "the Securities

Act of 1933, the Securities Exchange Act of 1934, [and] Regulations G [and] U . . . of the Board of Governors of the Federal Reserve System." (SA:276.) Comdisco further represented and warranted:

> No part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G [or] . . . Regulation U . . . . Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G [or] . . . Regulation U . . . .

(SA:283-84.)

In discussing Comdisco's guaranty, the Facility Agreement repeatedly referred to the "collateral securing the Guaranteed Debt." However, the Agreement also provided:

> No Collateral. Notwithstanding any reference herein to any collateral securing any of the Guaranteed Debt, it is acknowledged that, on the date hereof, neither the Company nor any Borrower has granted, or has obligation to grant, any security interest or other lien on any of its property (including, without limitation, the Restricted Stock) to the Lenders as security for the Guaranteed Debt.

(SA:290.) "Guaranteed Debt" included the principal of and interest on the loans to the borrowers, plus any other fees the Borrowers owed pursuant to the Notes. (SA:288.)

The Borrowers elected to participate in the SIP Program, executing a SIP option exercise form and a Letter of

Direction, authorizing the Bank to pay the proceeds of the loan to Comdisco. Each Borrower also executed an SIP Note. The proceeds of the SIP Loans were remitted to Comdisco as consideration for the purchase of the SIP shares. Comdisco caused the appropriate number of shares to be allocated and transferred to its Registrar and Transfer Agent, Mellon Investor Services, LLC, for the Borrowers' benefit. The Borrowers opened accounts at the First National Bank of Chicago in order to receive distributions of stock dividends that were used to offset payments due under the SIP Notes.

Within six months, Comdisco's stock split, doubling the number of shares each SIP participant had obtained. And in just over two years, the stock was trading at $53 per share. Several SIP participants sold their shares at a price that not only satisfied their loan obligations but also earned them a profit, even after sharing with Comdisco the required 50% of the balance of the gain realized on the sale. However, the tide turned and in July 2001, Comdisco filed for bankruptcy. This was an event of default under the Notes and caused Bank One to accelerate all amounts outstanding on the Notes. The bankruptcy also triggered an event of default under the Facility Agreement. The Lenders filed a proof of claim in Comdisco's bankruptcy for approximately $133 million. Comdisco settled its guarantor obligation to the Lenders for a payment of over $126 million in exchange for the Lenders' assignment to the Comdisco Litigation Trustee of all rights under the Notes against the Borrowers. The bankruptcy court approved the settlement, and the district court held that the

Trustee is the holder of the Notes with all rights of enforcement.

In 2005, the Trustee filed separate actions against each Borrower, seeking to enforce the SIP Notes. The Borrowers asserted several affirmative defenses, including fraud and duress. The Trustee moved for summary judgment against two of the defendants, James Duncan and Lyssa K. Paul. Duncan and Paul filed a cross-motion for summary judgment, arguing that the Notes were unenforceable based on violations of federal margin regulations. In December 2007, the district court denied their cross-motion and granted the Trustee's motion. The court determined that the Trustee proved his prima facie case on the SIP Notes and rejected the "primary defense that the SIP Program was fraudulent" (SA:177), having concluded that Comdisco's alleged misrepresentations were expressions of legal opinion that could not support a fraud claim. (SA:178.) The court further found that Duncan and Paul had not shown reliance on the alleged misrepresentations. (*Id.*). The court also concluded that the defendants could not assert the alleged illegality of the loans as an affirmative defense and thus rejected the argument that the loans were unenforceable. (SA:180.) As for the negligent misrepresentation defense, the court found based on the record that the defense was not available against Comdisco or the banks. The court rejected all other affirmative defenses.

The Trustee subsequently moved for summary judgment against the remaining defendants, incorporating its memorandum in support of its summary judgment mo-

tions against Duncan and Paul. The defendants amended their affirmative defenses, asserting that Comdisco committed securities fraud and violated securities laws in breach of contract, thus excusing the Borrowers' nonperformance. And the Trustee supplemented his memorandum to address the new defenses. The district court granted summary judgment to the Trustee, concluding that the SIP Plan did not violate the margin regulations and, even if it had, the defendants had no evidence of scienter and thus could not establish the Rule 10b-5 claim in their fifth affirmative defense. The court also decided that even if there was a technical violation of any regulation, such a violation did not render the Notes unenforceable because the defendants were not within the "zone of interests" protected by the regulations. Judgments were entered, and the Borrowers appealed.

Within a year of the entry of the judgments, the Trustee moved to correct or modify the judgments, seeking to increase the amounts of the judgments. We granted the district court leave to rule on the motion; amended judgments were entered; and the Borrowers timely appealed. The appeals were consolidated for disposition. Additional facts are discussed as appropriate.

## II. ANALYSIS

The Borrowers argue that the district court erred in (1) concluding that they could not assert violations of Regulations G and U as an affirmative defense; (2) concluding that Comdisco and Bank One did not violate the Regulations; (3) placing the burden of proving a violation of the Regulations on the Borrowers; (4) con-

cluding that even if the Borrowers proved regulatory violations, they could not avoid summary judgment in favor of the Trustee based on such violations; (5) granting summary judgment on the affirmative defenses based on illegality under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, illegality under Section 17(a) of the Securities Act of 1933, and the excuse-of-nonperformance defense; (6) extending its *Duncan/Paul* summary judgment rulings to the Borrowers; and (7) granting the Trustee's Rule 60(a) motion. We will address each argument as necessary.

## A.  Regulations G and U

The Borrowers contend that Comdisco violated Regulation G by extending purpose credit to each Borrower (in the form of Comdisco's guaranty to the Bank) secured by his margin stock in an amount exceeding 50% of the purchase price of the stock.[1] They claim that the Bank violated Regulation U by arranging for Comdisco to extend credit to them on better terms and conditions

---

[1] Regulation G provided: "*Limitation on extending purpose credit.* No lender . . . shall extend any purpose credit, secured directly or indirectly by margin stock in an amount that exceeds the maximum loan value of the collateral securing the credit as set forth in § 207.7 of this part ['The maximum loan value of any margin stock . . . is fifty per cent of its current market value.']." 12 C.F.R. § 207.3(b). Unless otherwise noted, all citations in this opinion are to the 1998 edition of the Code of Federal Regulations, which contains the versions of the regulations in effect at the relevant time.

than it could legally extend credit under the regulation. They also allege that the Bank violated Regulation U by extending purpose credit (the loan) to each Borrower, indirectly secured by his margin stock in an amount exceeding 50% of the purchase price of that stock.[2] In addition, they maintain that Comdisco and the Bank committed "purpose statement" violations of Regulation G or U by failing to obtain from each Borrower a Federal Reserve Form FR G-3 or U-1.[3]

### 1. Whether the Borrowers May Assert Violations of Regulations G and U as an Affirmative Defense

We begin by considering whether the district court erred in concluding that the Borrowers lacked standing to assert violations of Regulations G and U as an affirma-

---

[2] Regulation U provided: "*Arranging credit.* No bank may arrange for the extension . . . of any purpose credit, except upon the same terms and conditions under which the bank itself may extend . . . purpose credit under this part." 12 C.F.R. § 221.3(a)(3). It also provided: "*Extending credit.* No bank shall extend any purpose credit, secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the collateral securing the credit." *Id.* § 221.3(a)(1).

[3] Regulation G required that in the case of extension of credit secured directly or indirectly by margin stock, "the lender shall require its customer to execute Form FR G-3." 12 C.F.R. § 207.3(e). And Regulation U required a bank that extends such credit in an amount greater than $100,000 to "require its customer to execute Form FR U-1." *Id.* § 221.3(b).

tive defense. The district court's conclusion was based on *Bassler v. Central National Bank*, 715 F.2d 308 (7th Cir. 1983), which held that investment borrowers have no private right of action against investment lenders under Section 7(d), Section 29(b),[4] or any other provision of the Securities Exchange Act of 1934. *Id.* at 313. The district court also relied on *Blair v. Bank One, N.A.*, 307 B.R. 906 (N.D. Ill. 2004), *appeal dismissed in light of settle-*

---

[4] Section 7(d) provides in pertinent part: "It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section." 15 U.S.C. § 78g(d).

Section 29(b) provides: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ." 15 U.S.C. § 78cc(b).

*ment with instructions to dismiss sub nom. In re Comdisco, Inc.*, No. 04-2108, 2005 WL 6136323 (7th Cir. Jan. 28, 2005), *and vacated by Blair v. Bank One, N.A.*, 1:03-cv-3095 (N.D. Ill. Mar. 31, 2008), which applied *Bassler*. The Borrowers contend that the district court erred in relying on *Bassler* and *Blair*. We agree.

The *Bassler* plaintiff entered into a series of loan transactions to finance the purchase of stock and pledged the stock as security for the notes. The bank failed to obtain a Regulation U statement from him, which he claimed violated Section 7(d) of the Securities Exchange Act and Regulation U. The plaintiff sought a judgment voiding the loans. The district court dismissed the complaint, holding that no private action was available. *Bassler*, 715 F.2d at 308-09. The plaintiff asserted that Section 7(d) and Section 29(b) implied a private right of action for borrowing investors against lending banks. *Id.* at 309, 311. We affirmed the district court, holding there was no right of action in investment borrowers as against investment lenders. *Id.* at 313.

*Blair* took *Bassler* a step further. Bank One filed a proof of claim in Comdisco's bankruptcy proceeding for the outstanding loans to SIP participants. *Blair*, 307 B.R. at 908. Comdisco filed an objection seeking to void Bank One's claim based on alleged margin violations. Several SIP participants (including most of the Borrowers in our case) intervened and sought a declaratory judgment that Bank One could not pursue its claims against them. The bankruptcy court held that neither Comdisco nor the intervenors had statutory standing to challenge the

legality of the loans underlying Bank One's claim. On appeal to the district court, Comdisco and the intervenors asserted that the loans violated Regulation U and that Section 7(d) and Section 29(b) of the Securities Exchange Act provided them with a defense to Bank One's claim. They argued that *Bassler* was not controlling because they wished to assert an affirmative defense, not a separate cause of action. The district court rejected the argument as "one of semantics," *Blair*, 307 B.R at 909, noting that they were seeking a judgment in their favor rather than raising an affirmative defense. *Id.* The court concluded that *Bassler* was controlling because the intervenors sought a declaration that the loans were void. *Id.* at 909-10. The appellants argued that they could assert Regulation U violations as an affirmative defense under Section 7(d), relying primarily on *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979). *TAMA* held that § 215(b) of the Investment Advisers Act of 1940 created a private right of action in clients of investment advisers to void an investment contract based on violations of the Act. *Id.* at 18-19. The court was not persuaded. It said that *Bassler* had addressed *TAMA*, concluding that *TAMA* "did not require an implied right of action arising from § 7(d)." *Blair*, 307 B.R. at 910 (citing *Bassler*, 715 F.2d at 311-12). Thus, *Blair* read *Bassler* as precluding a party from raising margin violations defensively.

However, *Bassler* was an action by a plaintiff investor against a lending bank to void a contract. *Bassler* did not hold that Section 7(d) and Section 29(b) cannot be

raised defensively by a borrower against a lender in an action to enforce a contract, which is the case presented here. Thus, *Blair* extended *Bassler* beyond its reach. Neither *Blair* nor *Bassler* offers authority for the proposition that the Borrowers need a private right of action under Section 7(d) or Section 29(b) in order to assert an affirmative defense that the Notes are void and unenforceable because they violate Section 7(d) and Regulations G and U.

No private right of action under a statute is necessary to assert a violation of that statute as an affirmative defense. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86 (1982) (allowing defense under § 8(e) of the National Labor Relations Act where defendant had no private right of action to enforce the statute); *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 566 (1961) (holding conflict of interest on the part of a government official who participated in contract negotiations in violation of federal law rendered contract unenforceable); *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 88 (1902) (assuming that only the Attorney General could bring an action to enforce the Sherman Act, yet allowing the defense that the contract was illegal under the antitrust laws); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 980 F.2d 449, 455 (7th Cir. 1992) (noting that illegality may be a defense to contract even though statutes that make conduct illegal ordinarily prescribe public remedies); *Johnston v. Bumba*, 764 F. Supp. 1263, 1279 (N.D. Ill. 1991) (allowing defendant to assert as a defense to an action on a promissory note that the securi-

ties were sold in violation of securities laws), *aff'd on other grounds*, 983 F.2d 1072 (7th Cir. 1992). *Kaiser Steel* explains:

> Refusing to enforce a promise that is illegal under the . . . laws is not providing an additional remedy contrary to the will of Congress. A defendant proffering the defense seeks only to be relieved of an illegal obligation and does not ask any affirmative remedy based on the . . . laws. "[A]ny one sued upon a contract may set up as a defence that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defence to the action."

455 U.S. at 81 n.7 (quoting *E. Bement & Sons*, 186 U.S. at 88). Recognizing that only the National Labor Relations Board could provide affirmative remedies for unfair labor practices, *id.* at 86, the Court held that "a court may not enforce a contract provision which violates [federal law]." *Id.*; *see also id.* at 83 ("[A] federal court has a duty to determine whether a contract violates federal law before enforcing it."). By refusing to enforce a contract that violates a statute, the court serves the public interest of deterring contracts in violation of the law and promoting adherence to the law. *Id.* at 77; *see also N. Ind. Pub. Serv. Co. (NIPSCO) v. Carbon Cty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) (refusing to enforce a contract that violates a statute deters behavior forbidden by that statute). Accordingly, the Court held that the defendant was entitled to raise and have adjudicated its defense that the agreement sued on was void and unen-

forceable as in violation of federal law. *Kaiser Steel*, 455 U.S. at 77-86.

The Trustee attempts to distinguish these authorities; he stops short, however, of challenging whether they support the proposition that no private right of action is needed to assert an affirmative defense of illegality. He first argues, citing *Kaiser Steel* and *Rush-Presbyterian*, that some of the cases relied on by the Borrowers required the parties asserting the illegality defense to show that the statute at issue was designed to protect their interests. *Kaiser Steel* did say that a defense under § 8(e) of the National Labor Relations Act could be "raised by a party which § 8(e) was designed to protect." *Id.* at 86. But this was in the context of addressing whether the district court had authority to adjudicate a defense based on the illegality of a promise under the antitrust and labor laws, or whether the NLRB had exclusive jurisdiction over the matter. *See, e.g., id.* at 83 ("We also do not agree that the question of the legality of the . . . [promise] under . . . the NLRA was within the exclusive jurisdiction of the [NLRB]. . . ."). In that context, the Court stated a general rule with broad applicability: "a court may not enforce a contract provision which violates [federal law]." *Id.* at 86.

The Trustee also overreads *Rush-Presbyterian.* In that case, two Chicago hospitals sued the government of Greece and two of its agencies for payment of bills for more than $500,000 for services provided in connection with kidney transplants. The defendants argued that

one of the hospitals could not collect for its services because it had not obtained a required state permit. *Rush-Presbyterian*, 980 F.2d at 451, 455. The illegality defense did not fail on the ground that the statute did not provide a private right of action or was not designed to protect the defendants' interests. Instead, we followed the equitable, balancing approach that applies when a contract itself is not illegal but is carried out in an illegal manner, and determined that the hospital's failure to comply with the permit requirement did not bar it from collecting payment. *Id.* at 455-56; *see also NIPSCO*, 799 F.2d at 272-74 (applying equitable, balancing approach where, assuming a violation "lurking somewhere in the background, the contract itself is not illegal"). Important to our decision was the fact that barring recovery would produce a sanction disproportionate to the wrong. *Rush-Presbyterian*, 980 F.2d at 455-56. Thus, the defendants were allowed to assert the defense of illegality; they just lost on the merits.

The Trustee next argues that other cases relied on by the Borrowers such as *Mississippi Valley Generating Co.* and *E. Bement & Sons* involved challenges to contracts or conduct whose very subject matter was illegal or infected by an illegal conflict of interest. Some of the cases fall within this category; others such as *Rush-Presbyterian* do not. Furthermore, "a court has the power to refuse to enforce a contract when enforcement would violate clearly articulated congressional goals and policies." *Stuart Park Assoc. v. Ameritech Pension Trust*, 51 F.3d 1319, 1326 (7th Cir. 1995).

The Trustee asserts that "[i]t has long been held that a party is not entitled to raise a violation of a statute as an affirmative defense unless it can be shown that the party asserting the defense possesses a private right of action under that statute." Appellee Br. 14 n.2. He cites *Inland Commercial Property Sales, Inc. v. Atlantic Assocs., Inc.*, No. 90 C 1036, 1991 WL 278311, at *4 & n.3 (N.D. Ill. Dec. 18, 1991) (striking affirmative defenses based on noncompliance with statute because defendant "does not have a private cause of action pursuant to the Real Estate License Act and therefore cannot raise these affirmative defenses"), and *Farm Credit Bank of St. Louis v. Dorr*, 620 N.E.2d 549, 551-53 (Ill. App. Ct. 1993) (concluding that a private cause of action is necessary to assert a claim based on noncompliance with a statute whether the claim is made in a complaint or as an affirmative defense). These are the only authorities cited for this proposition and they are relegated to a footnote. These decisions are not persuasive; they erred in requiring a private right of action as a prerequisite to the assertion of a statutory violation as an affirmative defense.

Furthermore, Section 29(b) of the Securities Exchange Act provides the Borrowers with the right to raise violations of the Act and margin regulations defensively to preclude enforcement of a contract. As stated, *TAMA* held that Section 215(b) of the Investment Advisers Act created a private right of action in clients of investment advisers to void an investment advisers contract. The language of Section 215(b), 15 U.S.C. § 80b-1-15, closely parallels the language of Section 29(b). While the Court noted that the statutory sections involved were "intended

to benefit the clients of investment advisers," *TAMA*, 444 U.S. at 17, it stated that "whether Congress intended additionally that these provisions would be enforced through private litigation is a different question," *id.* at 18. To answer that question, the Court looked to the legislative history, which was silent on the issue, and the statutory language. *Id.* at 15-19. The Court concluded:

> [T]he statutory language itself fairly implies a right to specific and limited relief in a federal court. By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract.

*Id.* at 18. The Court then observed that it has "recognized that a comparable provision, § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), confers a 'right to rescind' a contract void under [that statute]." *Id.* at 18-19 (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 388 (1970)). And in *Mills*, a stockholders' action to set aside a corporate merger allegedly in violation of the Securities Exchange Act, the Court stated that Section 29(b) "establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party." *Mills*, 396 U.S. at 387-88 (approving of the interpretation of Section 29(b) as rendering a contract "voidable at the option of the innocent party"); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1051 (7th Cir. 1997) (affirming

dismissal of counterclaim for specific performance or damages under agreement that violated the Securities Exchange Act and Rule 10b-5 as "void as regards the rights of [the violator] under Section 29(b) of the Act"). Accordingly, *TAMA* supports the conclusion that a borrower has the right under Section 29(b) to assert violations of the Securities Exchange Act and margin regulations as an affirmative defense to a breach of contract action.

The Trustee asserts that *TAMA*, *Mills*, and *Sundstrand* are in harmony with *Bassler* because the statutory provisions violated in those cases were intended to benefit the parties seeking redress through Section 29(b). It is true that *TAMA* and *Mills* addressed whether the statute at issue created a cause of action, and *Sundstrand* similarly considered whether a party could assert a claim to enforce a contract. Nonetheless, their reasoning supports the assertion that the Borrowers may assert the alleged margin violations as affirmative defenses. And there is more authority reinforcing the Borrowers' position. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735 (1975) (dictum noting that Section 29(b) provides "that a contract made in violation of any provision of the [Securities Exchange] Act is voidable at the option of the deceived party"); *Natkin v. Exch. Nat'l Bank of Chi.*, 342 F.2d 675, 676 (7th Cir. 1965) ("[A] violation such as here alleged [making loans in violation of Regulation U] operates to void the contract rights of the party in violation"); Staff Opinion of May 5, 1982, Federal Reserve Regulatory Service 5-900.11 ("Contracts made in violation of Regulation U are voidable under Section 29(b) of the [Exchange Act]."). Allowing the Bor-

rowers to assert the alleged violations of Regulations G and U as an affirmative defense is consistent with the *Restatement (First) of Contracts* § 598 (1932), which sets forth the general rule that a party to an illegal bargain cannot recover damages for breach of contract. It is also consistent with the *Restatement (Second) of Contracts* § 178 (1981), which provides: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable . . . ." Section 29(b) expressly provides that any "contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void. . . ." 15 U.S.C. § 78cc(b).

*Shearson Lehman Bros., Inc. v. M & L Invs.*, 10 F.3d 1510 (10th Cir. 1993), is cited as additional authority for the view that the Borrowers cannot assert violations of margin regulations as an affirmative defense. In *Shearson*, a stockbroker brought a breach of contract action and the purchasers asserted an affirmative defense for non-payment based on the broker's violation of Regulation T, a margin regulation. The court found that the broker violated the regulation, *id.* at 1514, but concluded there was no affirmative defense to breach of contract for such violations. *Id.* at 1516. The court thought this con-clusion was "most consistent" with the policy behind Regulation T and other regulations which protect the market in general. *Id.* Another consideration was that the Securities Exchange Act and Regulation X required clients to comply with margin requirements. The court reasoned that since "the regulations place the burden

of margin requirement compliance equally upon broker and client, it [would be] inconsistent to place the entire burden of compliance upon brokers in contract disputes." *Id.* In this case, though, it remains to be determined whether the Borrowers were responsible for compliance with margin requirements. Regulation X exempts from compliance "[a]ny borrower who obtains purpose credit within the United States, unless the borrower willfully causes the credit to be extended in contravention of [the regulations]." 12 C.F.R. § 224.1(b)(1).

Moreover, Section 29(c) of the Securities Exchange Act implies a right to assert a violation of the Act or Regulation G or U defensively under Section 29(b). Section 29(c) provides in pertinent part:

> Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit . . . unless at the time of the making of such loan or extension of credit . . . the person making such loan or extension of credit . . . shall have actual knowledge of facts by reason of which the making of such loan or extension of credit . . . is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation . . . by any person who shall have acquired such debt [or] obligation . . . in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt [or] obligation . . . .

15 U.S.C. § 78cc(c). By setting forth circumstances under which a loan or extension of credit cannot be avoided, Section 29(c) implies that a loan or extension of credit can be avoided under other circumstances. *See* Charles F. Rechlin, *Securities Credit Regulation* § 11:11 n.19 (2d ed. 2007, database updated June 2010); *cf. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 286-87 (7th Cir. 2009) (concluding that the Labor Management Relations Act implied a right in labor organizations to sue officers for breach of fiduciary duties and stating that "[b]y nullifying any exculpatory provisions, the statute removes a possible *defense* to liability. It follows that the union must have a statutory remedy for liability for breach against which this sort of defense might potentially be asserted.").

The Trustee asserts that "the illegality defense may only be asserted against contracts that are 'intrinsically illegal'" and not in cases where one party would have to violate a statute to perform its obligations, citing *NIPSCO*. But *NIPSCO* itself refutes this argument. NIPSCO and a coal company entered into a contract for the purchase of coal for twenty years. NIPSCO became able to buy electricity at prices below the costs of generating electricity from coal and stopped accepting coal deliveries. It then sued the coal company, seeking a declaration that it was excused from its obligations under the contract. NIPSCO argued that the contract violated the Mineral Lands Leasing Act, which prohibited railroads from holding leases or permits to mine coal except for its own use for railroad purposes, because the coal company was affiliated with a railroad. *NIPSCO*,

799 F.2d at 267-68. We stated: "this is not a case where the contract itself is illegal." *Id.* at 272. Nonetheless, the analysis did not stop there. We assumed that the contract violated the Act and considered whether the contract was nonetheless enforceable. *Id.* at 273. We compared the pros and cons of enforcement of the contract, and concluded that the balance favored enforcement. *Id.* at 273-74. Similarly, in *Rush-Presbyterian*, we held that the illegality defense did not bar the hospital from collecting unpaid bills. We determined that the forfeiture of $200,000 in voiding the contract was an excessive punishment for an offense punishable by a fine of $10,000. We noted that the permit violation was neither a serious affront to public policy nor harmful to the public welfare as would justify nonenforcement. *Rush-Presbyterian*, 980 F.2d at 455-56. In effect, we weighed the pros and cons, or the equities, of enforcement.

In any event, the Trustee ultimately acknowledges that "the weight of authority . . . holds that Section 29(b) renders contracts made in violation of the regulations voidable at the option of an innocent and unwilling party." While he may dispute whether the Borrowers were innocent and unwilling parties, that determination is for the district court. Given Section 29(b)'s provision for voiding contracts made in violation of the Act or any rule or regulation thereunder, the fact that neither Regulation G nor Regulation U has a self-contained provision for doing the same thing is no bar to the affirmative defense.

The Trustee asserts that when presented with the illegality defense, "a court must critically examine the claimed statutory violations and determine whether it is being asked to enforce the precise conduct that is made unlawful by the statute, or if it is merely being asked to give legal effect to an agreement that was otherwise lawful." If the Borrowers are right that Comdisco and/or the Bank violated Regulation G or U, then enforcing the parties' contracts would appear to enforce the very conduct prohibited by the regulations. That would make this case unlike *Kelly v. Kosuga*, 358 U.S. 516, 521 (1959), in which an unlawful agreement to fix the price of onions was divisible from a lawful agreement to pay for purchased onions.

The district court erred in concluding that a private right of action under Section 7(d) or Section 29(b) is a prerequisite to asserting margin violations as an affirmative defense. The court misread *Bassler*; that case did not address whether a private right of action is necessary to raise a violation of law defensively. Similarly, the court erred in concluding that the illegality defense failed because the defendants were outside the "zone of interests" protected by the margin regulations. The "zone of interests" requirement is a limitation of prudential standing to maintain an action. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004); *Winkler v. Gates*, 481 F.3d 977, 979-80 (7th Cir. 2007). The Borrowers do not seek to maintain an action under the Securities Exchange Act or Regulations G and U, but rather, to defend against an action based on alleged violations of the statute and regulations. They therefore need not estab-

lish that they fit within the zone of interests protected by those laws to be entitled to assert their affirmative defense.

Accordingly, we find that the district court erred in deciding that the Borrowers could not assert alleged violations of Regulations G and U as an affirmative defense. Therefore we must consider whether the district court also erred in granting summary judgment on the ground that Comdisco and the Bank did not violate Regulation G or U.

### 2. Whether the Regulations Were Violated

The Borrowers assert that in moving for summary judgment, the Trustee did not challenge whether Comdisco violated Regulation G. It seems they are correct. (See SA:442—Consol. Suppl. Mem. Supp. Pl.'s Mots. Summ. J. 10 ("the SIP Defendants have not and cannot prove that *the Lenders* violated the margin restrictions set forth in Regulation G or Regulation U." (emphasis added)); see also Consol. Mem Supp. Pl's Mots. Summ. J. Against Duncan & Paul 20-SA:180 (asserting that the defendants had no standing to raise a Regulation U violation as an affirmative defense)). As such, the Borrowers were under no obligation to present all of their evidence of Regulation G violations in order to defeat the Trustee's summary judgment motion. *See, e.g., Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence

on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment."). (Of course, the Borrowers would have had to prove Regulation G violations to obtain summary judgment in their favor.) It would be unfair to uphold a grant of summary judgment in favor of the Trustee based on the lack of evidence that Regulation G was violated because the Borrowers did not have an adequate opportunity to respond to such an argument.

As for the Bank's alleged violations of Regulation U, the Trustee argued that the Bank had not relied on the SIP shares as collateral, thus asserting the good-faith non-reliance exception to the meaning of "indirectly secured." *See* 12 C.F.R. § 221.2(g)(2)(iv) (stating that "indirectly secured" "[d]oes not include . . . an arrangement [under § 221.3(g)(1)] if: . . . [t]he bank, in good faith, has not relied upon the margin stock as collateral in extending . . . the particular credit"); 12 C.F.R. § 221.117 (discussing when a bank in "good faith" has not relied on stock as collateral). This good-faith non-reliance exception only applies to extension or maintenance violations; it does not apply to arranging violations. *See* 12 C.F.R. §§ 221.2(g)(2)(iv), 221.117(a). (Nor would it apply to Comdisco and its alleged violation of Regulation G.)

Furthermore, whereas the burden of establishing the affirmative defense of illegality would be on the Borrowers, the Trustee bore the burden of proving the

good-faith non-reliance exception. *Cf. Knox v. Cook Cnty. Sheriff's Police Dep't*, 866 F.2d 905, 907 (7th Cir. 1988) (stating that the statute of limitations is an affirmative defense but the burden of proving an exception thereto is on the plaintiff). "[T]he question of whether or not a bank has relied upon particular stock as collateral is necessarily a question of fact to be determined . . . in the light of all relevant circumstances." 12 C.F.R. § 221.117(b). The record establishes genuine issues of material fact as to whether the Bank satisfied the two criteria that provide "some indication" that it has not relied on the stock as collateral such that the exception applies:

> (1) the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan, and

> (2) the loan was not payable on demand or because of fluctuations in market value of the stock, but instead was payable on one or more fixed maturities which were typical of maturities applied by the bank to loans otherwise similar . . . .

*Id.* Some of the Borrowers' financial statements support a reasonable inference that the statements could not reasonably support the loan. For example, a loan was made in excess of $1,000,000 to one borrower (05-737) who reported no net worth to the Bank, a loan was made to another borrower (05-745) for almost ten times his net worth, and loans were made to two other borrowers (05-735 & 05-726) for more than five times their net worths. The transcript of the SIP presentation lends

support to the inference that the Bank did not rely on the financial statements; Comdisco's representatives essentially said as much to the prospective SIP participants. (See SA:367 ("Obviously, most of us don't have a credit that can support a quarter million or half million, whatever the number is, of loans, but there is a Comdisco guaranty there. However, if someone is in bankruptcy, [the Bank] probably would not let [the loan] go through.").) In addition, in arguing that the Bank satisfied the good-faith non-reliance exception, the Trustee did not assert that the SIP Notes were "payable on one or more fixed maturities *which were typical of maturities applied by the bank to loans otherwise similar . . . .*" 12 C.F.R. § 221.117(b) (emphasis added). Thus, the Trustee did not carry his burden in proving that the Bank in good faith did not rely on the stock as collateral.

In determining whether Regulations G and U were violated, the district court considered whether the SIP shares directly or indirectly secured the loans or the guaranty. It wrote: "The restrictions placed on the SIP shares do suggest that the shares indirectly secured the loans, and if the court were writing on a totally clean slate, it might agree with defendants' argument. But the slate is not entirely clean. . . ." *Costello v. Haller*, 2008 WL 4646335, at *5 (N.D. Ill. Sept. 24, 2008). The court then considered that before implementing the SIP Program, Comdisco, through its outside legal counsel, Lola Hale, sought an opinion from the Federal Reserve Bank that the SIP loans would not be directly or indirectly secured by the securities purchased through the SIP Program. Hale received a response in the form of a

letter from James B. McCauley, Senior Attorney for the Federal Reserve Bank of Chicago. The McCauley letter opined that the "proposed transaction d[id] not constitute a loan secured 'directly or indirectly' by the purchased stock as contemplated by Regulations G and U." (SA:512.) The letter stated that "[t]his opinion relies heavily upon your assertion that 'there is no reference . . . either in the note or in the Facility Agreement to any restriction on the transfer of the securities to be purchased . . . nor do those securities form collateral for the Note.' " (*Id.*) McCauley also wrote that "[t]he legal staff of the Board of Governors [presumably of the Federal Reserve System] has been consulted . . . [and] has concurred in this opinion," but emphasized that the opinion was a staff opinion only—not that of the Board and that "different facts could compel a different conclusion." (SA:513.)

The Borrowers correctly pointed out to the district court that Hale's letter requested concurrence only that Bank One's loan would not be deemed to be, directly or indirectly, secured by the securities purchased. It did not ask whether Comdisco's guaranty would be directly or indirectly secured by the stock, whether Comdisco's guaranty would violate Regulation G, or whether Bank One would commit an "arranging" violation of Regulation U. The Borrowers also stated that Hale's letter failed to mention several restrictions on the stock, including that Comdisco had a right of first refusal on a sale of the shares; Comdisco's Compensation Committee could impose restrictions on the timing, amount, and form of the sale of the shares; and the stock could not be

pledged as collateral for any other loan. The Notes and Facility Agreement referred to the stock as "Restricted Stock," and the Agreement referred to the "collateral securing the Guaranteed Debt." The district court agreed that Hale's letter did not provide a complete list of the restrictions on the stock, but concluded that it set out the "key restriction" that "any outstanding amounts on the loan would be paid from the proceeds of any sale of the stock at any time." *Costello*, 2008 WL 4646335, at *6. The court found this restriction to be the most suggestive "that the loans (or guarantee) were indirectly secured by the stock because it is this restriction that would most likely ensure repayment of the loan." *Id.* Because "the Board" was informed of this restriction, the court saw "no reason to reject Hale's reliance on that opinion in advising Comdisco as to the legality of the Plan." *Id.* The district court gave the opinion in the McCauley letter substantial weight and concluded that the SIP Plan did not violate either Regulation G or U. *Id.*

The Borrowers contend that the district court erred in deferring to the McCauley letter. The Trustee responds that it is unclear whether the court gave a heightened level of deference to the letter and, in any event, the court was entitled to defer to its reasoning. Although the court stated that it was giving the staff's opinion substantial weight, other language in its decision implies that it may have deferred to what it believed (mistakenly) was an official opinion of the Federal Reserve Board. The court said that "the Board and its staff ha[ve] primary responsibility for inter-

preting the Exchange Act and [its] regulations," citing
*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565-68
(1980) (holding that deference was appropriate to official
staff opinions of Federal Reserve Board interpreting
the Truth in Lending Act and Regulation Z, unless demon-
strably irrational), and *Revlon, Inc. v. Pantry Pride, Inc.*,
621 F. Supp. 804, 815 (D.C. Del. 1985) ("this Court will
accord substantial weight to the [Federal Reserve
Board] staff's opinions"). The reliance on *Milhollin* and
*Revlon* suggests that the district court thought the
opinion was from "the Federal Reserve Board."

But the McCauley letter is not an official staff opinion
of the Federal Reserve Board. McCauley works for the
Federal Reserve Bank of Chicago, not the Federal
Reserve Board. The Board and the Federal Reserve
Banks are "two expressly independent statutory entities*."
Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve
Sys.*, 132 F.3d 985, 989 (4th Cir. 1997). The Board is
created and empowered by subchapter II of Title 12 of
the United States Code, 12 U.S.C. §§ 241-250; the
Federal Reserve banks are created and empowered by
subchapter IX, 12 U.S.C. §§ 341-361. The authority to
apply and enforce Section 7(d) of the Securities
Exchange Act is delegated to the Securities Exchange
Commission, 15 U.S.C. §§ 78u(d), 78u-3(a)—not the
Federal Reserve Bank of Chicago. And the authority to
undertake "administrative lawmaking" is delegated to
the Board of Governors. 12 U.S.C. § 248(k). The Board
may delegate certain of its functions to Federal Reserve
banks, but it may not delegate any of its functions "re-
lating to rulemaking or pertaining principally to mone-

tary and credit policies." 12 U.S.C. § 248(k). Although McCauley consulted with the staff of the Board of Governors and the staff agreed with his opinion, the McCauley opinion was not published in the *Federal Reserve Regulatory Service,* the looseleaf service published by the Board which includes official staff opinions, *see* 12 C.F.R. § 261.10(d)(4), or any other official source.

The Trustee asserts that "the best reading" of the district court's opinion is that it followed *Krzalic v. Republic Title Co.,* 314 F.3d 875, 879 (7th Cir. 2002) (explaining that an agency's less formal pronouncements may be entitled to some deference), and gave the McCauley letter something less than *Chevron*-style deference, see *Chevron USA, Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837 (1984). This appears to be deference under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) (an agency's interpretation may be entitled to some deference according to its "power to persuade"). *See United States v. Mead Corp.,* 533 U.S. 218, 235-38 (2001). Yet it is unclear how the Trustee reaches this conclusion. Neither *Krzalic, Chevron,* nor *Skidmore* was mentioned in the district court's opinion. Nonetheless, the McCauley letter is some indication that the regulations were not violated, and the court could have considered it. *Cf. Skidmore,* 323 U.S. at 140 (stating that informal agency "opinions . . . while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance"); *see also Sehie v. City of Aurora,* 432 F.3d 749, 753 (7th Cir. 2005) (considering but ultimately finding unpersuasive opinion letters of

the Department of Labor interpreting the meaning of a regulation promulgated under the Fair Labor Standards Act).

However, given the omissions in Hale's letter and the qualifications to the McCauley opinion, it cannot be said that the record conclusively establishes that the SIP Plan did not violate Regulation G or U. In *Mead*, the Court reiterated that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency . . . ." 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139). The determination whether deference is owed turns on the "'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . .'" *Id.* at 228 (quoting *Skidmore*, 323 U.S. at 140); s*ee also Am. Fed'n of Gov't Emps. v. Rumsfeld*, 262 F.3d 649, 656 (7th Cir. 2001) ("informal [agency] interpretations are entitled to respect to the extent that they have the power to persuade" (quotations omitted)). The Borrowers argued that the McCauley letter was not entitled to deference based in part on the omissions in Hale's letter. The district court apparently thought that it owed the McCauley opinion some deference. On remand, the district court should assess how much deference, if any, is due to the McCauley opinion, and further determine whether the record raises a reasonable inference that the SIP shares indirectly secured the loans and/or secured the guaranty.

We emphasize that the issue is not whether the stock directly secured the Bank's loans, but whether the stock indirectly secured the loans and/or secured the guaranty. In arguing that the stock did not indirectly secure the loans, the Trustee contends that the Borrowers failed to identify any restriction or limitation on the stock itself requiring that the stock or its proceeds be used to pay the Bank. In response, the Borrowers identify several restrictions on the SIP shares, which they claim implicate 12 C.F.R. § 221.2(g)(1)(i), which states that "*Indirectly secured* (1) Includes any arrangement with the customer under which: (i) The customer's right or ability to sell, pledge, or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding . . . ." The Trustee replies that the identified restrictions all operate in favor of Comdisco, not the Bank, and, as a result, the shares cannot amount to an indirect security—at least not in favor of the Bank. The Trustee claims that there was no restriction in the SIP Notes or any other transaction document providing that the SIP shares could not be pledged as security for other loans. But he cannot dispute that there were restrictions on the SIP shares, and the SIP participants were told that they could not pledge the shares as collateral for other loans.

The Trustee further states that even if the stock was restricted, the definition of "indirectly secured" is not satisfied because the Bank in good faith did not rely on the stock as collateral for the loans. *See* 12 C.F.R. § 221.2(g)(2)(iv). He submits that the following facts show that the Bank did not rely on the stock as col-

lateral: (1) the Borrowers—not Comdisco or the Bank—controlled the stock, (2) the Bank structured the transaction so it could collect the principal and interest without having to liquidate the stock in the event of default on the loans; and (3) the Bank could rely on Comdisco's guaranty in the event of defaults on the loans. However, the evidence shows that the shares were held by Mellon Bank, Comdisco's transfer agent, in a special account that only certain Comdisco officers could sign to release the shares to ensure that the shares would not be sold or transferred without paying off the Note. (SA:496.) The accounts were described as "inaccessible" (*id.*), presumably meaning that they were inaccessible to the SIP participants. We are unsure how the structure of the transaction shows that the Bank in good faith did not rely on the stock as collateral. Rather, the structure of the transaction seems to suggest that the loans were not directly secured by the shares. The Trustee points to the lack of any right of Comdisco to sell or transfer the SIP shares without authorization from the SIP participants. Yet each of the participants had to execute a stock power endorsed in blank that was held by Comdisco or Mellon Bank and would allow the holder to sell the shares in the open market or transfer the shares to itself. Thus, each participant effectively authorized Comdisco to sell his or her SIP shares. The Trustee claims "the Bank could not have relied on the stock as collateral because it had Comdisco's guaranty, and . . . Comdisco had sufficient assets to satisfy its obligations under the guaranty without resorting to the stock." This unsupported conclusory

assertion does not establish as a fact that the Bank did not rely on the stock as collateral. In addition, the Trustee offers no explanation why the Bank could not have relied on both the stock and the guaranty, and we are unaware of any. The Bank relied on Comdisco's guaranty, which one could reasonably find was secured by the stock. Thus, there is at least a reasonable inference that the Bank indirectly relied on the stock as collateral for the loans.

As noted earlier, the Trustee did not contest whether Comdisco violated Regulation G. If Comdisco committed "extending" violations of Regulation G, then it seems that the Bank likewise committed "extending" and "arranging" violations of Regulation U. *See* 12 C.F.R. § 221.3(a)(3) ("No bank may arrange for the extension . . . of any purpose credit, except upon the same terms and conditions under which the bank itself may extend . . . purpose credit under this part."); 12 C.F.R. § 221.118 (referencing 12 C.F.R. § 207.103). In addition, the Trustee does not contest that neither Federal Reserve Form FR G-3 nor Form FR U-1 was provided to the Borrowers. Thus, if the guaranty and loans were secured directly or indirectly by the stock, then Comdisco and the Bank would have committed "Purpose Statement" violations of Regulations G and U as well. *See* 12 C.F.R. § 207.3(e) (in the case of extension of credit secured directly or indirectly by margin stock, the "the lender shall require its customer to execute Form FR G-3); 12 C.F.R. § 221.3(b) (requiring a bank when extending credit secured directly or indirectly by margin stock in an

amount exceeding $100,000 to obtain an executed Form FR U-1 from its customer).

We do not decide whether Comdisco or the Bank violated Regulation G or U, however. It is enough that there are genuine issues of material fact as to whether the regulations were violated and, if so, whether the Bank satisfied the good-faith non-reliance exception.

### B.  Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5[5]

The Borrowers argue that the grants of summary judgment in favor of the Trustee on the Section 10(b) illegality

---

[5] Section 10(b) makes it "unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it "unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

defense should be vacated as well. The Trustee sought summary judgment on this defense solely on the basis that the Borrowers could not prove any false statement ("falsity"). He did not challenge whether they could establish the intent to deceive or reckless disregard for the truth ("scienter"). Then in reply, he argued that because he sought summary judgment based on falsity, the Borrowers had the burden to establish all elements of the Section 10(b) defense.

As the moving party, the Trustee had the initial burden of identifying the basis for seeking summary judgment. *See Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmovant is not required to present evidence on an issue not raised by the movant. *See, e.g.*, *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi*, 449 F.3d at 765 ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment."). The fact that the Borrowers filed an expansive response brief, a Rule 56.1 response, and a statement of additional facts did not alter this rule. The responsive filings did not create a right in the

Trustee to assert for the first time in reply new challenges to the Borrowers' evidence as to other aspects of the Section 10(b) illegality defense. The Trustee offers no authority to support his novel view that the "rather unusual course of the motion for summary judgment" made it necessary and proper for him to attack the additional elements on which he initially had taken a pass. Granting summary judgment on the basis of the newly raised scienter argument raises important fairness concerns, especially where the Borrowers alerted the district court in their motion to strike that they had additional evidence supporting the scienter element.

The Trustee asserts that the Borrowers deprived themselves of the opportunity to present evidence on the scienter element: They offered some, but not all, of their evidence on scienter. We are unaware of any authority that required them to marshal all the evidence that they had on an issue that was not asserted by the Trustee in seeking summary judgment. Had scienter been properly placed in issue, the Borrowers may have presented other evidence, or sought an extension and discovery under Rule 56(f). The Trustee criticizes the Borrowers for not seeking leave to file a sur-reply. But "there is no requirement that a party file a sur-reply to address an argument believed to be improperly addressed," *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 n.1 (7th Cir. 2008), and a party need not "seek leave to file a sur-reply in order to preserve an argument for purposes of appeal. . . ." *Id.* The Borrowers were not wrong in their understanding of their summary judgment obligations. While their choice may have been

strategic—they could have sought leave to file a sur-reply and/or filed a Rule 56(f) affidavit—we will not insist that they have done so when the rules and case law give them options on how to proceed. And by addressing the newly raised arguments in their motion to strike, the Borrowers did not become obligated to present all of their evidence on the issue. Argument is not a substitute for facts supported by evidence as necessitated by Rule 56. The district court should not have granted summary judgment on the basis of the newly raised scienter argument. *See, e.g.*, *Sublett*, 463 F.3d at 736.

On a related point, the Borrowers indicate that the district court held them to a heightened standard of proof of scienter. Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), the district court looked for evidence that would raise a "strong inference" of scienter. *Tellabs* dealt with the heightened pleading standard for private securities fraud suits under the Private Securities Litigation Reform Act ("PSLRA"), Section 21D(b)(2) of which provides that a complaint shall allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Neither the PSLRA nor *Tellabs* changed the well-established summary judgment standard. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008) (noting that the PSLRA pleading standard is not the same as the summary judgment standard). Indeed, the Court observed that "the test at each stage [pleading, summary judgment, and judgment as a matter of law] is measured against a different backdrop." *Tellabs*, 551 U.S. at 324 n.5. On summary judg-

ment, a court may not weigh the evidence or decide which inferences should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010). Rather, the court's task is to determine based on the record whether there is a genuine issue of material fact requiring trial. *Celotex Corp.*, 477 U.S. at 330; *Anderson*, 477 U.S. at 249; *Kodish*, 604 F.3d at 507. The district court erred in holding the Borrowers to proof of facts that would raise a strong inference of scienter.

The district court had the discretion to rule on the summary judgment motions without relying on the newly raised arguments in the Trustee's reply. On reviewing the Trustee's reply brief and learning that the newly raised arguments might have merit, the court could have offered the Borrowers an opportunity to file a sur-reply and additional evidence. It did not. Instead, it denied their motion to strike as moot. But the Borrowers' objection to consideration of the newly raised arguments did not become moot by the fact that the district court (1) decided to consider them and (2) decided them favorably toward the Trustee. The analogy offered by the Borrowers is apt: "It would be as if the plaintiff moved for a jury trial and the judge, without ruling on the motion, conducted a bench trial, rendered judgment for the defendant, and then dismissed the plaintiff's motion as moot.*" Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1027 (7th Cir. 2006). And because the district court's decision does not explain why it thought the motion to strike was moot,

we are unsure how much consideration it gave to that motion.

The Trustee submits that we can affirm the grants of summary judgment on the Section 10(b) illegality defense on several alternative grounds—there is no evidence of any fraudulent misrepresentation, the Borrowers seek an unwarranted extension of the private right of recovery under Section 10(b), they have no evidence of a manipulative or deceptive device, the alleged misrepresentations regarding Regulations G and U were not made "in connection with the purchase or sale" of a security, the Borrowers cannot prove reliance, and they cannot show that any alleged misrepresentation was material. The Trustee cites *Ruth v. Triumph Partnerships*, 577 F.3d 790 (7th Cir. 2009), for the proposition that "'[w]e may affirm summary judgment on any basis supported in the record.'" *Id.* at 796 (quoting *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008)). This statement was made in the context of addressing the appellant's claim that the appellee could not make a particular argument because it had not cross-appealed— a procedural situation quite different from what we have here. *Ruth* and the cases it cites do not address whether we may affirm a grant of summary judgment on an alternative ground newly raised in summary judgment reply brief. Although "we may affirm a grant of summary judgment on any alternative basis found in the record as long as that basis was adequately considered by the district court and the nonmoving party had an opportunity to contest it," *Best v. City of Portland*, 554 F.3d 698, 702 (7th Cir. 2009), we may not affirm on

a basis that was not raised in support of summary judgment, *id.* at 702-03 (reversing grant of summary judgment and remanding where "there [was] not enough of a record . . . to affirm on an alternative basis").

Here, the alternative bases argued by the Trustee were not raised in the district court until the filing of the reply, and the Borrowers did not have an adequate opportunity to contest them. Further, it is unclear whether the district court gave any consideration to these other grounds. Thus, it would be unfair to affirm summary judgment on these alternative bases, and we decline the Trustee's invitation to do so. The grants of summary judgment to the Trustee on the Section 10(b) illegality defense were in error.

### C.  Section 17(a) of Securities Act of 1933

As an affirmative defense, the Borrowers claimed that the Notes are unenforceable because Bank One and Comdisco violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). They alleged that "[t]he materially false and misleading statements, omissions, and course of conduct of Bank One and Comdisco were made and employed as part of a scheme in order to deceive the SIP Participant, to obtain the SIP Participant's property, and to operate as a fraud upon the SIP Participant . . . ." The version of Section 17(a) in effect at the time of the transactions at issue read:

> It shall be unlawful for any person in the offer or sale of any securities by the use of any means

or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

> (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

The Borrowers contend that the grants of summary judgment on their Section 17(a) defense should be vacated because the district court did not articulate any basis for granting summary judgment independent of its holding that Regulations G and U were not violated. The Trustee responds that the court relied on other bases and implies that it concluded that the Borrowers failed to establish that Comdisco had the requisite scienter to establish a Section 17(a) violation. He also argues that the Borrowers have waived any other arguments they may have regarding the Section 17(a) defense by failing to assert them on appeal, which is correct. *See,*

*e.g.*, *Mendez v. Perla Dental*, No. 08-2029, ___ F.3d ___, ___, 2011 WL 1990527, at *3 (7th Cir. May 24, 2011).

The district court's reasoning for granting summary judgment on the Section 17(a) defense is cryptic. As the appellee, the Trustee may defend the judgment based on any argument raised below. *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 892 (7th Cir.), *cert. denied*, 131 S. Ct. 443 (2010). However, he has chosen to defend on only one: the Borrowers' failure to establish that "Comdisco had an intent to deceive, manipulate or defraud." (Appellee Br. 59.) As discussed, the district court erroneously granted summary judgment on the ground that the Borrowers failed to offer evidence of scienter.[6] Therefore, the grants of summary judgment on the Section 17(a) illegality defense should be vacated.

### D.  Extension of the *Duncan/Paul* Rulings

The Borrowers contend that the district court erred in extending its *Duncan/Paul* summary judgment rulings.

---

[6] Proof of scienter is an element of a violation of § 17(a)(1), but not § 17(a)(2) or (a)(3). *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980); *see also Mueller v. Sullivan*, 141 F.3d 1232, 1235 (7th Cir. 1998). The Borrowers' allegations that the "materially false and misleading statements, omissions, and course of conduct of Bank One and Comdisco were made and employed as part of a scheme to deceive the SIP Participant" (SA:136) seem to fall within § 17(a)(1). The Borrowers' reply brief implies that this defense falls under § 17(a)(2) or (a)(3). We leave this matter for the district court's determination, if necessary.

The court's opinion states that "[t]he instant defendants raise the same counterclaims and defenses and the court's ruling in [*Duncan/Paul*] will not be revisited." *Costello*, 2008 WL 4646335, at *3. The Borrowers argue that such language shows that the district court did not reach the substance of their defenses but merely gave its earlier rulings preclusive effect. Although one might draw such a conclusion if the quoted language is taken out of context, we do not read this language in a vacuum. The record reveals that the district court gave the Borrowers an opportunity to present their own arguments and evidence and gave them some consideration. We understand the district court as saying that it was adopting both its prior rulings and its supportive reasoning. (Whether the grants of summary judgment were proper based on the same grounds on which it was granted against Duncan and Paul is another question addressed below.)

The Borrowers challenge the grants of summary judgment on the fraud set-off defense, which they assert was based on a lack of evidence of reliance by Duncan or Paul. In the *Duncan/Paul* decision, the district court noted that the defendants had not attempted to show reliance on the alleged misrepresentations. But the principal ground for the court's ruling was that the alleged misrepresentations were expressions of legal opinion, which cannot support a fraud claim. (SA:178 (citing *City of Aurora v. Green*, 467 N.E.2d 610, 613 (Ill. App. Ct. 1984) ("As a general rule, one is not entitled to rely upon a representation of law since both parties are presumed

to be equally capable of knowing and interpreting the law.")). Thus, it is not surprising that the court did not view the Borrowers' declarations, which seem to support a reasonable inference of reliance, as requiring a result different from that reached in *Duncan/Paul*. (The Trustee does not argue that the Borrowers' affidavits could *not* support a reasonable inference of justifiable reliance; he merely criticizes them as self-serving. (See Appellee's Br. 60-61.) As a result, he has waived any such argument for purposes of this appeal.[7] *See, e.g.*, *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (declining to consider argument not made on appeal)).

Nonetheless, the district court's analysis falters. The Borrowers argue that they identified an exception to the general rule that legal opinions cannot support a fraud claim and the district court never considered it. *See West v. W. Cas. & Sur. Co.*, 846 F.2d 387 (7th Cir. 1988). In *West*, we recognized that under Illinois law, "[a] statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context." *Id.* at 393. We quoted an Illinois Supreme Court opinion:

---

[7] In connection with the § 10(b) illegality defense, the Trustee did assert that the Borrowers could not show reliance. But he has not defended the application of the *Duncan/Paul* rulings to the appellants based on non-reliance, and we will not make a party's argument for him. *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

> Wherever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation.

*Id.* (quoting *Buttitta v. Lawrence*, 178 N.E. 390, 393 (Ill. 1931)). Thus, whether a statement is one of fact or opinion depends on the factual circumstances. *Id.* Factors to be considered in determining whether a plaintiff reasonably relied on an opinion as though it were a statement of fact include "the access of the parties to outside information," the parties' relative sophistication, and whether "the speaker has held himself out as having special knowledge." *Id.* at 393-94. Therefore, "it is not 'the form of the statement which is important or controlling, but the sense in which it is reasonably understood.'" *Id.* at 394 (quoting *Prosser and Keeton on Torts* § 109, at 755 (W. Keeton 5th ed. 1984)). The district court's opinion does not reflect consideration of whether the alleged misrepresentations should be treated as statements of fact under this authority.

The Trustee further argues that the district court did not have to address the fraud set-off defense in order to rule in his favor because it concluded that the Borrowers failed to present evidence of scienter, which is necessary to prove a fraud set-off claim. As discussed, the court erred in granting summary judgment on the

basis of a lack of proof of scienter. *E.g.*, *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."). So, too, it would be error to extend the *Duncan/Paul* rulings on the basis of a lack of evidence of scienter, particularly where the Trustee did not even argue below that a failure of proof of scienter warranted summary judgment on the fraud set-off defense. *Cf. Best*, 554 F.3d at 702-03. The district court erred in granting summary judgment to the Trustee on the fraud set-off defenses.

The Borrowers also challenge the district court's failure to address the merits of their negligent misrepresentation set-off defense. In the *Duncan/Paul* summary judgment ruling, the court held that the record did not support the claim that either Comdisco or the Bank was "in the business of supplying information for the guidance of others in their business transactions" (SA:182), which is necessary for that defense. The Borrowers submit that they had such evidence but the court did not consider it. The Trustee has not challenged this assertion on appeal, and our review of the materials cited by the Borrowers suggests that they may have enough evidence to raise an issue of fact on this matter. Whether they have presented enough evidence to satisfy the "in the business of supplying information" element and whether they ultimately can prevail on their negligent misrepresentation defense are for determination in the district court.

### E. Excuse-of-Nonperformance Defense

The Borrowers' final challenge is to the grants of summary judgment on their excuse-of-nonperformance defense. Under Illinois law, they argue, the Bank's compliance with Section 17(a), Section 10(b), and Regulation U were implied terms of the parties' contracts and, by failing to comply with these laws, the Bank breached the contracts, excusing their performance. The Trustee does not dispute that under Illinois law, laws in existence at the time a contract is executed, "are deemed, in the absence of contractual language to the contrary, 'part of the contract as though they were expressly incorporated therein.'" *Selcke v. New England Ins. Co.*, 995 F.2d 688, 689 (7th Cir. 1993) (quoting *McMahon v. Chi. Mercantile Exch.*, 582 N.E.2d 1313, 1319 (Ill. App. Ct. 1991)); *see also Ill. Bankers' Life Ass'n v. Collins*, 341 Ill. 548, 552 (1930). Thus, Section 17(a), Section 10(b) and Regulation U are implied terms of the Notes. The Borrowers assert that the Bank's noncompliance with these laws excuses their performance. A "party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement. . . ." *George F. Mueller & Sons, Inc. v. N. Ill. Gas Co.*, 336 N.E.2d 185, 189 (Ill. App. Ct. 1975). And a material breach of a contract will excuse the other party's performance. *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002).

The Trustee first responds that the loans were not illegal. Although he focuses on compliance with the margin regulations, the defense is based not only on alleged margin rule violations but also on violations of

Section 17(a) and Section 10(b). The grants of summary judgment on the Section 17(a) and Section 10(b) defenses were error, and it remains to be determined whether the Bank violated a margin regulation. The Trustee also maintains that the excuse-of-nonperformance defense fails because the Borrowers are not in the zone of interests protected by the margin regulations, citing *Thomson McKinnon Securities, Inc. v. Clark*, 901 F.2d 1568 (11th Cir. 1990), for support. The case is inapposite. There, a broker sued a former client to recover payment on his account. The client raised as an affirmative defense the broker's breach of exchange rules, which were incorporated into the parties' agreements. *Id.* at 1570. The court rejected the defense because the client requested the broker to ignore a contract term by placing a trade on his behalf, thus waiving the term as a condition precedent to his obligation. *Id.* at 1571.[8]

Second, the Trustee argues that the Borrowers impliedly waived any breach by accepting the loan proceeds, participating in the SIP Program, and failing to object to the SIP Program or Notes until they had lost the opportunity to profit from the program. As the party claiming waiver, the Trustee had the burden to prove

---

[8] In the district court, the Trustee also relied on *ADM Investor Servs., Inc. v. Collins*, 515 F.3d 753 (7th Cir. 2008); he does not do so here. *ADM Investor Services* held that a trader's "failure to post required margin for a futures contract does not excuse him from paying." *Id.* at 757. Here, in contrast, the Borrowers assert that the Bank's noncompliance with the law excuses their performance.

that the Borrowers (1) knew of their right to assert the Bank's breaches, and (2) intended to waive the alleged breaches. *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991). Yet he did not do so in this court or in the district court. Furthermore, the Trustee's reliance on the Borrowers' failure to raise any objection to the SIP Program or Notes reveals the weakness of his position. "An implied waiver may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it." *Wolfram P'ship, Ltd. v. LaSalle Nat'l Bank*, 765 N.E.2d 1012, 1026 (Ill. App. Ct. 2001). Implied waiver arises "where (1) an unexpressed intention to waive can be clearly inferred from the circumstances or (2) the conduct of the waiving party has misled the other party into a reasonable belief that a waiver has occurred." *Id.* The Trustee has not identified the facts in the record that would support a finding of implied waiver. Thus, he has not adequately developed his waiver argument, and the result is a waiver of the waiver argument on appeal. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008).

Third, it is argued that if the Bank breached the contracts by lending money in violation of the margin regulations, then the Borrowers also breached the contracts by borrowing money in violation of the margin regulations. The Trustee asserts that the Borrowers cannot profit from their own breach of the margin regulations, citing *Goldstein v. Lustig*, 507 N.E.2d 164, 168 (Ill. App. Ct. 1987) ("A party who materially breaches a contract cannot take advantage of the terms

of the contract which benefit him."). It is not clear that the Borrowers violated the margin regulations. Regulation X exempts a borrower from the margin regulations "unless the borrower willfully causes the credit to be extended in contravention of Regulation G, T, or U." 12 C.F.R. § 224.1(b)(1). The record before us does not establish that the Borrowers willfully caused the Bank to extend credit in violation of one of these regulations.

The district court erred in granting the Trustee summary judgment on the Borrowers' excuse-of-nonperformance defense.

### III. CONCLUSION

For the foregoing reasons, the district court's grants of summary judgment in favor of the Trustee are VACATED and these appeals are REMANDED for further proceedings consistent with this opinion. Given our disposition of the appeals from the grants of summary judgment, the appeals from the Amended Judgments are DISMISSED AS MOOT.

We appreciate the substantial efforts that the district court and counsel have expended in these matters to this point. However, for reasons discussed above, more needs to be done before this litigation can be put to rest.