In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1424

GAI LEVY,

*Plaintiff-Appellant,*

*v.*

MARION COUNTY SHERIFF, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 17-cv-03090 — **Jane Magnus-Stinson**, *Chief Judge.*

ARGUED SEPTEMBER 6, 2019 — DECIDED OCTOBER 18, 2019

Before FLAUM, SYKES, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant Gai Levy brought
this lawsuit against defendants-appellees, the Marion County
Sheriff and the Consolidated City of Indianapolis and Marion
County (collectively, "defendants"), alleging constitutional
violations under 42 U.S.C. § 1983 for unlawfully detaining
him. Levy contends that on two separate occasions defend-
ants violated orders from a trial court to release him from cus-
tody. In particular, he asserts that the policies and practices

defendants used to communicate with the courts about individual defendants led to his prolonged detention. Defendants moved for summary judgment on Levy's § 1983 claims. The district court granted their motion. We affirm.

## I. Background

Before diving into the specifics of this case, it is helpful to understand how the Marion County Sheriff's Office receives information from the Marion County Superior Courts and how the Sheriff's Office then executes those court orders. The courts and the Sheriff use two different systems for their case management needs. The courts' system is called Odyssey and the Sheriff's is called Offender Management System (OMS). Both systems use event codes to indicate a court's order, but integration between the two systems since their adoption in 2014 has proven challenging, given the systems' difficulty communicating with each other. To remedy this problem, the Information Services Agency for the Consolidated City of Indianapolis and Marion County developed a special data exchange system to ensure the transfer of data from the courts to the Sheriff's Office.

This solution was imperfect. For example, when a court ordered a detainee released subject to placement at Marion County Community Corrections (MCCC), the court could enter an "ORC" code (the "Self-Report code"), which directed the Sheriff to release the detainee from custody so he could self-report to MCCC on his own. Alternatively, the court could enter an "SBDOA" code (the "Direct Transfer code"), which instructed the Sheriff to maintain the detainee in custody until he could be directly transported to MCCC for processing and release. After the Sheriff received either a Self-Re-

port or Direct Transfer code, it placed the detainee in the "release workflow." The release workflow was a process whereby the Sheriff's Office automatically generated a list of detainees for whom the court had entered release codes. After that, the Sheriff's inmate records staff reviewed the list to verify that each detainee was eligible to be released immediately or transferred for release. Once they completed the verification process, the inmate records staff removed the detainee from the release workflow.

Because the release workflow could not automatically process updated release orders, problems arose when the courts modified an order as to a detainee who had already cleared the process. The Sheriff's Office knew of this flaw and had reached an agreement with the courts to have court staff contact the Sheriff's inmate records staff any time there was a subsequent order in the same case to ensure that the Sheriff's Office was operating with the most current information. It is undisputed that if court staff did not notify the Sheriff's Office about such updates or modifications, the Sheriff would process a detainee based on the original release order it received.

With that context in mind, we turn our focus to Levy's case. The Sheriff's Office took custody of Levy after his arrest on an outstanding warrant on February 29, 2016. The parties agree that Levy remained in the Sheriff's custody until March 3, 2016, when it transferred him to MCCC. (MCCC released Levy later that same day.) Beyond that basic timeline, though, the parties disagree about when the Sheriff's Office received an order from the court to release Levy.

According to Levy, the judge at his first court appearance ordered him released on his own recognizance, and because the Sheriff's Office did not immediately release him after that order, Levy argues that the Sheriff unlawfully detained him. To support his version of events, Levy points to this screen-shot of his case file in OMS, which he contends shows that officer Roberto Juan Rodrigues entered "Order To Release From Custody" as the "Court Event" on February 29, 2016, at 23:50:



The Sheriff's Office, however, asserts that the judge ordered that the Sheriff keep Levy in custody until he could be transferred directly to MCCC; it was not until Levy's second court appearance on March 2, 2016, that a different judge ordered Levy to self-report to MCCC. By that time, the Sheriff asserts, the inmate records staff had already finished processing Levy through its release workflow. It is undisputed that no one at the court called or emailed the Sheriff's Office about the second order, and therefore, that the Sheriff never received notice of the second order. Ultimately, the Sheriff's Office processed Levy and kept him in custody until March 3,

2016. To support their version of the timeline, defendants direct our attention to the certified copy of the Case Summary in Levy's case, which shows that the court entered a Direct Transfer code on March 1, 2016, but later entered a Self-Report code on March 2, 2016:

**CASE SUMMARY**
CASE NO. 49G09-1509-F6-032996

0000
Razumich, John Douglas
*Retained*
317-536-3339(F)
317-983-5333(W)
*156 E. Market St*
*13th Floor*
*Indianapolis, IN 46204*
*john@rdlawoffice.com*

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 03/01/2016 | Warrant or Writ of Attmnt for the Body of a Person Served | |
| 03/01/2016 | Court Sets Bond<br>Party: Defendant Levy, Gai<br>*$500cash* | |
| 03/01/2016 | Upon Satisfaction Of Bond, Party Held For Other Agency<br>Order Signed: 03/01/2016<br>Party: Defendant Levy, Gai<br>*community corrections* | |
| 03/01/2016 | Administrative Event<br>*court card given* | |
| 03/01/2016 | Hearing Scheduling Activity<br>*Initial Hearing scheduled for 03/02/2016 at 1:30 PM.* | |
| 03/01/2016 | Cash Bond Entered in Clerk's Office | |
| 03/01/2016 | **Interim Condition for Levy, Gai** (Judicial Officer: Crawford, Barbara)<br>*GPS* | |

PAGE 2 OF 7

CASE SUMMARY
CASE NO. 49G09-1509-F6-032996

| | |
|---|---|
| | - Community Corrections<br>- Electronic Monitoring |
| 03/01/2016 | No Contact Order Issued (Judicial Officer: Snyder, James Kevin - C )<br>Order Signed: 03/01/2016<br>*SEE REGISTRY* |
| 03/01/2016 | No Contact Order Issued<br>Order Signed: 03/01/2016<br>*Order Signed: 9/16/2015\r\nParty: Gai Levy\r\nPOR - No Contact Order - Pretrial Release*<br>*Issued by MR JAMES SNYDER* |
| 03/01/2016 | No Contact Order Issued<br>Order Signed: 03/01/2016<br>*Order Signed: 9/16/2015\r\nParty: Gai Levy\r\nPOR - No Contact Order - Pretrial Release*<br>*Issued by MR JAMES SNYDER* |
| 03/02/2016 | **Initial Hearing** (1:30 PM)  (Judicial Officer: Huerta, Ronnie -M)<br>*Commenced and concluded*<br>Parties Present:   State Plaintiff       State of Indiana<br>                          Prosecutor           Cicchini, Daniel Joseph<br>                          Defendant            Levy, Gai |
| 03/02/2016 | Hearing Scheduling Activity<br>*Pretrial Conference scheduled for 04/13/2016 at 9:00 AM.* |
| 03/02/2016 | Report to Community Corrections |
| 03/02/2016 | Probable Cause Affidavit Filed<br>File Stamp: 03/02/2016 |
| 03/02/2016 | Probable Cause Found: Order Issued (Judicial Officer: Huerta, Ronnie -M )<br>Order Signed: 03/02/2016 |
| 03/02/2016 | Advisement of Rights Conducted (Judicial Officer: Huerta, Ronnie -M ) |
| 03/02/2016 | Omnibus Date<br>*05/01/2016* |
| 03/02/2016 | No Contact Order Issued (Judicial Officer: Huerta, Ronnie -M )<br>Order Signed: 03/02/2016 |
| 03/02/2016 | Order to Release From Custody (Judicial Officer: Huerta, Ronnie -M )<br>Order Signed: 03/02/2016 |
| 03/02/2016 | Report to Community Corrections |

Levy consequently alleged claims against defendants for
unreasonable seizure and detention under the Fourth
Amendment and deprivation of liberty without due process
under the Fourteenth Amendment. In addition, Levy insists
that the Sheriff's Office "instituted and maintained unreason-
able policies and practices that resulted in its keeping [him]

detained … after [he] had been ordered released by the Court and/or after legal authority for [his] detention had ceased."

Defendants moved for summary judgment on October 4, 2018, and they moved to exclude the testimony of Levy's expert on December 10, 2018. The district court granted both motions on February 11, 2019.[1] Regarding the motion for summary judgment, the district court first held that Levy's Fourteenth Amendment Due Process Clause claim could not proceed because "the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention." *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (first citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017); then citing *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018)).

As to whether Levy had raised any genuine disputes of material fact for a jury to resolve on his Fourth Amendment claim, the court first explained that it understood Levy to be challenging two policies or practices: (1) the use of Odyssey and OMS to transmit release codes from the Marion County Superior Courts to the Sheriff's Office (the "Transmittal Policy");[2] and (2) the practice of requiring court staff to contact the Sheriff when a release order had been modified (the "Change Notification Policy"). Because the court found it was undisputed that the Sheriff's Office did not receive notice of the Self-Report code before it released Levy, the court held the Sheriff's use of the Transmittal Policy alone could not have

---

[1] Levy does not appeal the district court's decision to exclude his expert.

[2] Although the district court did not explicitly say as much, we assume that the Transmittal Policy also includes the Sheriff's adoption and use of the release workflow.

caused Levy's harm. In considering the Change Notification Policy, the court considered four different time frames:

1. The time between Levy's arrest and the entry of a code on March 1, 2016 at 12:25 AM after his first court appearance.

2. The time between the entry of the first code and the entry of the second code on March 2, 2016 at 2:15 PM after his second court appearance.

3. The time between the entry of the second code and his transfer to MCCC on March 3, 2016 at 1:35 PM.

4. The time between his transfer to MCCC and his release from MCCC on March 3, 2016 at 7:30 PM.

The court emphasized that Levy did not challenge the Sheriff's authority to detain him during the first or fourth time periods; rather, Levy's complaint concerned the second and third time periods alone. In considering the second time period, the court reasoned that because Levy did not produce any evidence to contradict the Case Summary, which showed that the court had ordered Levy released "Upon Satisfaction of Bond, Party Held For Other Agency" and listed "community corrections" at the first court appearance, it followed that the Sheriff had the legal authority to detain Levy during that time period and thus his detention did not violate the Fourth Amendment.

Turning to the third time period, the court noted that defendants acknowledged that the failure of the Change Notification Policy caused Levy's detention during this time period, but the court underscored that because Levy did not produce evidence of other individuals being over-detained for the same reasons, Levy could not establish that defendants had

adopted a policy or practice of deliberate indifference; therefore, this time period could not serve as the basis of his claim either.

Levy now appeals.

## II. Discussion

We review a district court's grant of a motion for summary judgment de novo, interpreting all facts and drawing all reasonable inferences in favor of the nonmoving party. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed R. Civ. P. 56(a)). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may affirm the entry of summary judgment on any ground supported in the record, so long as the moving party adequately presented the issue in the district court and the non-moving party had an opportunity to contest it. *O'Brien*, 900 F.3d at 928.

### A. Dispute of Material Fact

One of the issues Levy raises on appeal is the district court's finding that no reasonable jury could conclude that the Sheriff received a Self-Report code after his first court appearance. Levy focuses on the evidence he submitted to the district court, namely a screenshot of his case file in OMS, which he argues shows that officer Roberto Juan Rodrigues entered "Order To Release From Custody" as the "Court Event" on

February 29, 2016, at 23:50.[3] Levy contends that the district court dismissed his characterization of the screenshot in favor of the explanation given by the Sheriff's Chief Information Officer, Derek Peterson, in his affidavit. Peterson asserted that the screenshot did not show what code the court entered at Levy's first court appearance, but that the certified copy of the Case Summary did contain that information, and that record showed an entry of "Upon Satisfaction of Bond, Party Held for Other Agency" on March 1, 2016, which would have prompted a Direct Transfer code, not a Self-Report code.

By favoring Peterson's interpretation of the OMS screenshot over Levy's, the court, in Levy's view, made an impermissible credibility determination. Levy maintains that, in any event, the certified Case Summary does not *conclusively* refute his argument about an initial Self-Report code because it incorrectly states that Levy's arrest was on March 1, 2016; accordingly, a jury could reasonably infer from that discrepancy that the Case Summary is neither infallible nor dispositive as to the court's order regarding Levy's first appearance.

---

[3] Levy's lawyer attached the screenshot to a declaration filed in opposition to the Sheriff's motion for summary judgment. On appeal, defendants make several admissibility challenges to Levy's reliance on the OMS screenshot. But by raising those issues for the first time on appeal, defendants have forfeited those arguments. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1066 (7th Cir. 2000) ("[H]er attack on the admissibility of the affidavit is waived because she failed to raise it in the district court."); *see also Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 658 F.3d 760, 770 (7th Cir. 2011) ("To preserve an evidentiary objection for appeal, a party must make a 'timely objection or motion to strike … stating the specific ground of objection, if the specific ground was not apparent from the context.'" (quoting Fed. R. Evid. 103(a)(1))).

Defendants respond by highlighting that Levy has not presented any evidence to controvert Peterson's testimony about the meaning of the OMS screenshot.[4] Consequently, defendants insist that there is no dispute of fact as to the central question in this case—whether the court actually ordered the Sheriff to release Levy to self-report to the MCCC after his first court appearance. According to defendants, there is no dispute that the OMS screenshot does not support Levy's argument that the Sheriff's Office received an order to immediately release Levy to self-report to the MCCC after his first court appearance. And because the Case Summary supports defendants' contention that the Sheriff received an order to hold Levy at the MCCC after his first court appearance, defendants urge us to affirm the district court's judgment.

If the issue on appeal were simply one of dueling documents and the district court had picked defendants' asserted facts over Levy's, that act would constitute reversible error. Here, however, there are no such dueling documents. Both the OMS screenshot and the Case Summary contain many dates and codes. The OMS screenshot lists "Order To Release From Custody" next to the field "Court Event," but there are also dates listed: the field "Notification Made On" has "03/01/2016" listed, the field "Effective Date" has "02/29/2016" listed, and the field "Date/Time Added" has "02/29/2016 23:50" listed. To make matters more confusing,

---

[4] Levy had attempted to present an expert witness, Alison Shine, who would have asserted that a judge ordered Levy to self-report at his first court appearance on March 1, and that the Sheriff's Office had to have been aware of that order through the court's use of Odyssey and OMS. The district court, however, excluded Shine's testimony (as noted above) and Levy does not challenge that ruling on appeal.

the screenshot also lists dates that accurately describe events that occurred *after* Levy's first court appearance. For example, the field "Discharge Date" has "03/03/2016" listed, and at the bottom of the page, there is a table that displays "$500 cash" as a "Note" on the date of "03/01/2016 00:25."

Consequently, it would be unreasonable to infer that this screenshot only depicts information at the time the court had entered a code after the first court appearance. Similarly, it would be unreasonable to infer from the presence of a Self-Report code amidst this range of dates that the court entered a Self-Report code after the first court appearance. Moreover, in his affidavit, Peterson made the uncontroverted assertion that the OMS screenshot cannot be interpreted to show what code the court entered at Levy's first appearance. This testimony and evidence is enough to affirm the district court's decision that there was no dispute of material fact as to whether the court entered a Self-Report code after Levy's first court appearance. With that factual issue resolved, we move on to whether the district court properly entered summary judgment for defendants on the *Monell* claim.

### B. *Monell* Liability

Plaintiffs like Levy may sue municipalities under 42 U.S.C. § 1983 when their actions violate the Constitution. *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). To prevail on a *Monell* claim, plaintiffs must identify an action taken by the municipality, the requisite degree of culpability, and a causal link between the municipality's action and the deprivation of federal rights. *Bd. of the Cty. Commissioners v. Brown*, 520 U.S. 397, 403–04 (1997). A municipality "acts" through its written policies, widespread practices or customs, and the acts of a final decisionmaker. *Id.* A

municipality has the requisite degree of culpability if it acts with deliberate indifference to the known or obvious consequences of its action. *Id.* at 407.

The Sheriff's Office does not dispute that it created a system with the Marion County Superior Courts to process inmates for release utilizing Odyssey, OMS, and the release workflow, which included an agreement that if a court modified a release order, court staff would contact the Sheriff's inmate records staff to notify them of the change. Likewise, the Sheriff does not challenge the district court's decision to analyze this system as a policy or practice under *Monell*.

That said, it is critical to specify the exact policy or practice at issue here to properly conduct our analysis. As noted above, the district court discussed *Monell* as if there were two polices in this case—the "Transmittal Policy" and the "Change Notification Policy"—when determining whether the Sheriff's Office had acted with deliberate indifference. Levy argues that the two must be treated as one policy for the purposes of this appeal, and defendants appear to concede the same.

A review of the record supports this conclusion. The evidence suggests that the Sheriff's Office adopted the Change Notification Policy to ensure that it received notice of subsequent orders that may have been otherwise overlooked by the existing Transmittal Policy. Thus, the issue on appeal is whether Levy can establish that the Sheriff's adoption and use of this *modified* Transmittal Policy constituted deliberate indifference to a substantial risk of detainees' over-detention and whether that policy's adoption caused his own over-detention.

For the reasons explained below, we conclude that absent evidence that the Sheriff's Office knew or should have known that the modified Transmittal Policy would fail, or failed so often that it would obviously result in detainees' over-detention, Levy cannot to show that defendants acted with deliberate indifference.

Contrary to the district court's reasoning, Levy posits that to establish deliberate indifference, he is not required to show "other instances" where the failure to follow the Change Notification Policy caused prolonged detentions. This is so, he explains, because he challenges a "decision to adopt [a] particular course of action [ ] properly made by that government's authorized decisionmakers," and that is a sufficient basis to find municipal liability under § 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Levy believes that he has shown the Sheriff's Office took such a course of action here because he presented (1) evidence that the Sheriff selected OMS without properly vetting the software or considering its consequences; (2) evidence that the Sheriff used OMS despite multiple Marion County judges raising concerns about delayed releases and a group of those judges endorsing an entirely different software package; (3) evidence that the inmate records staff previously failed to timely process release orders entered by courts into Odyssey and received through OMS; (4) evidence of integration issues from the time of OMS's implementation; and (5) evidence that release information cannot be properly transmitted between Odyssey and OMS.

Defendants reject much of this evidence as "unproven allegations" that there were over-detention problems arising from different scenarios having nothing to do with the inmate

release policy developed between the courts and the Sheriff's Office.[5] Likewise, defendants believe the district court got it right when it cited *City of Oklahoma City v. Tuttle* to support its conclusion that Levy needed evidence of other instances of the relevant policy causing constitutional violations. 471 U.S. 808, 823–24 (1985).

As an initial matter, we have explained that the "more proof" that *Tuttle* describes is necessary to establish that "there is a true municipal policy at issue, not a random event." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *see also Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) ("We do not adopt any bright-line rules defining a 'widespread custom or practice.' … But the plaintiff must demonstrate that there is a policy at issue rather than a random event." (citations omitted)).

In this case, however, there is no concern that a policy is not at play. In fact, the Sheriff's Office acknowledged in its appellate brief that it "does not challenge the district court's decision to analyze this release process as a policy or practice under *Monell*." Moreover, the record supports Levy's narrative that by continuing to use the Transmittal Policy without any modification, defendants persistently pursued a course of action of selecting and continuing to use a case management system despite many concerns from stakeholders, numerous integration issues, and an inability to process updated release

---

[5] Levy is a putative class member in another case pending in the United States District Court for the Southern District of Indiana, *Driver, et al. v. The Marion County Sheriff*, Case No. 1:14-cv-2076, in which the plaintiffs challenge the Sheriff's purported policies and practices of holding detainees for up to seventy-two hours. He submitted experts' depositions and other documents from that litigation to support his claim in this case.

orders from the courts. Thus, if Levy's detention had occurred prior to the Sheriff's adoption of the Change Notification Policy, and he therefore challenged the use of the Transmittal Policy prior to the Change Notification Policy, then there may have been a question for the jury as to deliberate indifference.

But Levy's detention occurred *after* the Sheriff's Office took steps to address the purported problems with the Transmittal Policy. Thus, as in *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), we are faced with the question of whether a prison's use of a system with significant weaknesses can be considered deliberately indifferent, even after the prison has taken affirmative steps to address those weaknesses.

In *Armstrong*, a pretrial detainee asserted that the "will call" policy at the Allen County (Indiana) jail was constitutionally inadequate because "it display[ed] indifference to the rights of those arrested with a civil warrant to a prompt appearance before a court." *Id.* at 577. Specifically, the evidence showed that once the jail put detainees on the will call list, it took absolutely no action to ensure that they were given a court date and that they were not over-detained. *Id.* at 577–78. Although we explicitly noted that "the will call system in place at the time of Armstrong's arrest and detention … seem[ed] to amount to a policy of deliberate indifference," *id.* at 579, we decided the claim failed because "the jail had a backup plan—of sorts, at least—it accepted formal written complaints from the detainees." *Id.* The existence of this failsafe "show[ed] an awareness on the part of jail officials that a danger exist[ed] and an attempt to avert an injury from that danger." *Id.* Indeed, the "procedure saved the will call system from being deliberately indifferent." *Id.* at 579.

The logic of *Armstrong* applies with equal force here. Given the concerns regarding the Sheriff's ability to receive and act upon court orders processed through OMS, the Sheriff's Office created backup plans to address the limitations of its systems. First, it developed the release workflow process as part of the Transmittal Policy to ensure that the courts' orders were properly handled and effected. Second, and most importantly, the Sheriff's Office developed the Change Notification Policy, a modification of the release workflow process that required court officials to call or email the Sheriff with any modifications to prior court orders.

As in *Armstrong*, these actions "show[ed] an awareness on the part of jail officials that a danger exist[ed] and an attempt to avert an injury from that danger." Consequently, without evidence that the Sheriff's Office knew or should have known that these safeguards would fail, or failed so often that they would obviously result in over-detentions, we cannot conclude that defendants acted with deliberate indifference to the risk of detainees' over-detention. Levy's singular experience does not support a finding to the contrary.[6]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[6] Because the district court appropriately held that Levy did not present sufficient evidence to show deliberate indifference, we need not address the Sheriff's argument regarding causation.