In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1426

LEXINGTON INSURANCE COMPANY and NATIONAL
UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

*Plaintiffs-Appellants*,

*v.*

RLI INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:17-cv-01514-JBM-JEH — **Joe Billy McDade**, *Judge.*

ARGUED NOVEMBER 7, 2019 — DECIDED JANUARY 27, 2020

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In this contract dispute, two insurers of New Prime, Inc., a trucking company, accuse a third insurer of not paying its share toward two multimillion-dollar personal injury settlements. Plaintiffs Lexington Insurance Company and National Union Fire Insurance Company contend that defendant RLI Insurance Company underpaid

according to the policy it sold to New Prime, leaving National Union to make up the difference.

In the district court, Lexington and National Union sought a declaratory judgment as to the meaning of the RLI Policy and equitable contribution of $2.5 million from RLI toward the settlements in question. Both sides moved for summary judgment. Both based their motions on the language of the RLI Policy and on extrinsic evidence of the parties' intent. The district court granted summary judgment to RLI, relying exclusively on contract language that it found unambiguous. We affirm. The text of the RLI Policy is not as clear to us as it was to the district court, but undisputed extrinsic evidence shows that RLI's position is correct.

I.  *Factual and Procedural Background*

As a large commercial trucking company, New Prime faces substantial risks of tort liability. In the relevant years, New Prime managed and covered its own liability without insurance for the first $3 million of exposure per occurrence. But to protect itself from unusually large claims, New Prime bought excess liability insurance from three different companies: RLI, Lexington, and National Union. (Lexington and National Union are both wholly owned subsidiaries of the American International Group, Inc., and for most purposes we can refer to them together as AIG.) In contracting with several different insurers, New Prime followed a common industry practice to stack policies into sequential "layers" of excess insurance coverage.[1] This case concerns the threshold of liability at which RLI's responsibility ended and AIG's began.

---

[1] See Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 654–55 (1997) ("An insured's liability

The facts of the layers' sequential ordering are undisputed. New Prime, through its insurance agent Cottingham & Butler, contacted RLI in October 2011 and purchased a $2 million policy largely overlapping with the calendar year 2012. New Prime renewed the $2 million RLI Policy, with one relevant change we discuss later, for the years 2013, 2014, and 2015. Not until May 1, 2014 did New Prime, this time through the agents AmWINS and Regions, obtain a $5 million policy from Lexington to sit above RLI's layer. New Prime already had a $25 million "umbrella" policy from National Union to sit above Lexington's layer, and New Prime renewed that policy for the year starting May 1, 2014 as well. Both AIG policies were then renewed without changes for the year beginning on May 1, 2015.[2]

The two tragic accidents that led to this lawsuit occurred in 2015, when New Prime was covered by the RLI, Lexington, and National Union policies. On March 4, 2015, a New Prime tractor-trailer drifted into the median of Interstate 80 in Mercer County, Pennsylvania. The truck struck and severely injured Daniel Montini, who was changing a flat tire. See Memorandum Order, *Montini v. New Prime, Inc.*, No. 2:15-cv-1591, slip op. at 1 (W.D. Pa. Nov. 15, 2017). In February 2018, Montini settled his lawsuit against New Prime for $16 million. On December 28, 2015, near Santa Rosa, New Mexico, a New

insurance program generally includes a layer of primary insurance or self-insurance coverage followed by one or more layers of excess insurance.").

[2] "Umbrella insurance" is a generic term for excess insurance that does not perfectly "follow form" with the underlying insurance. Umbrella coverage can be both broader and narrower than the lower layers, depending on the specifics of the contracts. See generally Seaman & Kittredge, cited above in note 1, at 660.

Prime tractor-trailer rear-ended a sedan driven by Katherine and Samuel Herrera. Both were killed. See Complaint, *Tafoya v. New Prime, Inc.*, No. D412CV201600190 (N.M. Dist. May 19, 2016), 2016 WL 4411077. In March 2018, the Herreras' estates settled their claims against New Prime for $20 million.

The dispute here is over how much RLI needed to contribute first to the *Herrera* settlement and then to the later *Montini* settlement, which were so large as to trigger the excess insurance policies. The parties agree that, starting from the first dollar, New Prime itself was required to cover $3 million of costs or losses for each occurrence because of the so-called "Self-Insured Retention" built into the RLI Policy. In effect, the Self-Insured Retention made New Prime its own primary insurer up to $3 million per occurrence, with both RLI and AIG providing forms of excess insurance. See, e.g., *Kajima Const. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 313 (Ill. 2007) ("Excess insurance coverage attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted." (quotation omitted)).

The RLI Policy provided the next layer of coverage but came with a feature called the "Aggregate Corridor Deductible" or "ACD," which is the central focus of this lawsuit. Read alone, the main text of the RLI Policy would have provided for the first $2 million of coverage immediately above New Prime's $3 million Self-Insured Retention. An endorsement to the Policy, however, added the Aggregate Corridor Deductible and described its function (emphasis added):

> The Insured [i.e., New Prime] shall respond to, investigate, adjust, defend, and dispose of by payment or otherwise all losses and claims for losses covered by the Policy for which the total

> claim is greater than the $3,000,000 Self Insured Retention (SIR) *until the Aggregate Corridor Deductible of $2,500,000 has been satisfied*. Once the Aggregate Corridor Deductible has been exhausted by payment *for one or more losses & "costs"*, the Insured is only responsible for losses and "costs" up to [the] Per Occurrence Self Insured Retention.

The endorsement also specified that the ACD amounts to "$2,500,000 excess of the $3,000,000 Self Insured Retention." Although not a model of clarity, this endorsement obligated New Prime to pay out an additional $2.5 million above its Self-Insured Retention of $3 million per occurrence before RLI began to pay. But while the Self-Insured Retention applied to each covered incident, the $2.5 million ACD applied only once per year, so New Prime needed to pay that additional amount only once per policy year. On these basics RLI and AIG agree.

The dispute, however, is whether New Prime's payments toward the Aggregate Corridor Deductible diminished the amount that RLI owed on any claims. RLI argues that the ACD sat *within* RLI's $2 million layer, leaving RLI with no responsibility for making any payment on any claim until New Prime had both (a) paid $3 million per occurrence and (b) paid the year's ACD total on losses between $3 million and $5 million per occurrence. If that is correct, then New Prime and RLI would together owe at most $5 million on any claim: the $3 million Self-Insured Retention plus the $2 million RLI Policy. In contrast, AIG argues that the ACD sat *below* RLI's $2 million layer. On this view, RLI had to provide coverage whenever the loss exceeded the sum of the Self-Insured

Retention and remaining ACD balance. In other words, AIG asserts, "the ACD operates … as an additional $2.5 million self-insured retention applying per policy period." If that were correct, then AIG's duty to pay would not have been triggered until New Prime and RLI had together paid $7.5 million for the first big occurrence(s) of the policy year. The charts below illustrate the parties' respective views on how to allocate the first $10 million of the *Herrera* and *Montini* settlements, showing a dispute over $2.5 million.

RLI's Position                                          AIG's Position

 

At the time of the *Herrera* and *Montini* settlements, RLI insisted on its view of the Aggregate Corridor Deductible. It paid none of the *Herrera* settlement and only $1.5 million of the *Montini* settlement. AIG reserved its rights to recoup the alleged deficit of $2.5 million from RLI. Because the settlements exhausted Lexington's policy layer on any view of the

RLI Policy, it is National Union that seeks equitable contribution through this lawsuit.

The parties filed cross-motions for summary judgment in the district court. Both RLI and AIG attached to their motions extrinsic evidence, including email correspondence, underwriting files, and employee affidavits. Both sides referred to extrinsic evidence and disputed its significance in their summary judgment briefing. The district court declined to consider the evidence. The court found that the RLI Policy provided unequivocally that payments toward the Aggregate Corridor Deductible erode RLI's policy layer. The court entered summary judgment for RLI on that basis, and AIG appealed.

II. *Principles Governing Illinois Contract Interpretation*

The parties agree on appeal that Illinois law governs this contract dispute. In interpreting any insurance policy, the "primary function" of an Illinois court "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Thounsavath v. State Farm Mut. Auto. Ins. Co.*, 104 N.E.3d 1239, 1244 (Ill. 2018). This analysis ends with the text of the agreement if it is unambiguous: "A court will first look to the language of the contract itself to determine the parties' intent. … If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). On the other hand, if the contract language is ambiguous, Illinois courts may consider extrinsic evidence of the parties' intent. See *id.*; *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). On appeal, both AIG and RLI maintain that the RLI Policy was unambiguous in their favor; RLI also argues that the extrinsic

evidence provides an alternate basis for affirming the judgment in its favor.

Illinois courts treat contracts as ambiguous where the language of the contract is "susceptible to more than one meaning," *Thompson*, 948 N.E.2d at 47, or "obscure in meaning through indefiniteness of expression." *Central Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). "All the provisions of the insurance contract, rather than an isolated part, should be read together to interpret it and to determine whether an ambiguity exists." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007), quoting *United States Fire Ins. Co. v. Schnackenberg*, 429 N.E.2d 1203, 1205 (Ill. 1981). The mere fact of disagreement between the parties does not render language ambiguous, of course. *Thompson*, 948 N.E.2d at 48. Conversely, however, and equally obviously, "a contract is not necessarily unambiguous when, as here, each party insists that the language unambiguously supports its position." *Central Illinois Light*, 821 N.E.2d at 214.

In practice, Illinois courts do not hesitate to order consideration of extrinsic evidence if contract language alone cannot resolve a dispute. E.g., *Shapich v. CIBC Bank USA*, 123 N.E.3d 93, 99–100 (Ill. App. 2018) (reversing grant of summary judgment and remanding to trial court because both parties' interpretations contradicted portions of text); *Morningside North Apartments I, LLC v. 1000 N. LaSalle, LLC*, 75 N.E.3d 413, 419 (Ill. App. 2017) (same). With these principles in mind, we first consider the text of the RLI Policy.

III. *Textual Analysis*

The district court's construction of the RLI Policy was a legal finding, so we review it *de novo*. See, e.g., *Soarus L.L.C. v.*

*Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018). We agree with much of the court's analysis, but we ultimately cannot agree that the contract language unambiguously specified how the Aggregate Corridor Deductible operated.

The basic problem is that the RLI Policy failed to define the custom-tailored Aggregate Corridor Deductible feature or to describe its mechanics with precision. On the key question in this case—whether payments toward the ACD erode the policy limit—the contract was silent. A lengthy definitions section included such diverse terms as "bodily injury," "damages," "nuclear material," "we," and "you." Yet the word "deductible" appeared nowhere in the main text of the agreement. Without a policy definition, three endorsements to the Policy created the ACD and described some aspects of its operation. These provisions did not explicitly state whether the ACD eroded policy limits. We find that neither the reasoning of the district court nor the arguments of the parties fully dispel this ambiguity.

    A.  *Inconclusive Usage and Custom Arguments*

We first address a genre of argument on which both sides rely heavily. AIG contends that the Aggregate Corridor Deductible actually functioned as a "self-insured retention." RLI insists that it operated as a "deductible," as its name would suggest. With extensive citation to non-Illinois cases and secondary literature, the parties expound on these terms' meanings in insurance law, which they believe clarify the role of the ACD. Both sides, for example, cite Judge Hellerstein's opinion in the World Trade Center litigation, which explained the general distinction:

> A [self-insured retention] differs from a deductible in that a SIR is an amount that an insured retains and covers before insurance coverage begins to apply. Once a SIR is satisfied, the insurer is then liable for amounts exceeding the retention, less any agreed deductible. … In contrast, a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance.

*In re Sept. 11th Liability Ins. Coverage Cases*, 333 F. Supp. 2d 111, 124 n.7 (S.D.N.Y. 2004), citing 2 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 13.13[a] (12th ed. 2004).[3]

AIG and RLI both seek to label the ACD as one or the other and thus to determine how the RLI Policy worked. The name for such reasoning about contractual language is usage and custom. Courts have long recognized that technical trade usages can sometimes clarify contract terms. See *Shreffler v. Nadelhoffer*, 25 N.E. 630, 633 (Ill. 1890) (directing courts "to collect the real intention of the parties from the terms used in the

---

[3] AIG's brief omitted this excerpt's second sentence, which tends to favor RLI's position in this lawsuit, and, more troubling, did not even use an ellipsis or any other signal that text was omitted. See Appellant's Br. at 21. AIG's counsel initially said he thought the omitted sentence "wasn't relevant" to this case. He then retreated to the assertion that the omission was not intended to mislead the court, and he apologized to the court. Oral Arg. 35:20–36:30. We remind all counsel that they must not "knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities in any oral or written communication to the court." Lawyers' Duties to the Court, No. 5, Standards for Professional Conduct Within the Seventh Federal Judicial Circuit; see also Illinois Rule of Professional Conduct 3.3(a)(2) & cmt. [4].

contract, taking them in their plain, ordinary, and popular sense, unless by the known usage of the trade they have acquired a peculiar sense"); see generally 12 Richard A. Lord, Williston on Contracts § 34:5 (4th ed. 2019) ("It is currently the widely accepted rule that custom and usage may be proved to show the intention of the parties to a written contract or other instrument in the use of phrases of a peculiar technical meaning which, when unexplained, are susceptible of two or more plain and reasonable constructions.").

Along these lines, AIG and RLI both seek to import what they say are established industry understandings into the RLI Policy. At oral argument, counsel for AIG asserted that the ACD "bears every single characteristic of a self-insured retention recognized by the cases"—in function if not in name. Counsel for RLI responded that it was an "industry practice" and "accepted legal principle" that anything labeled a "deductible" erodes policy limits unless the policy states otherwise. Counsel went on to assert that New Prime and RLI "understood … what the word deductible meant; they didn't need to define it." These are assertions that usage and custom should guide our decision.

A threshold question, then, is whether an Illinois court would consider trade usage in this situation. Illinois law appears somewhat unsettled on just when parties may introduce such evidence. Compare *Illinois Ins. Guar. Fund v. Nwidor*, 105 N.E.3d 1035, 1046 (Ill. App. 2018) ("Usage or custom is admissible to explain or make clear what a contract means but not to contradict a meaning obvious on the face of the instrument."), with *Amalgamated Transit Worker's Union, Local 241 v. Pace Suburban Bus Div. of Reg'l Transp. Auth.*, 943 N.E.2d 36, 40 (Ill. App. 2011) ("[E]ngrafted on every written contract are the

customs, practices and definitions which are commonly understood and accepted by the parties."). That said, the situation here blurs the line between trade usage and everyday textual interpretation; AIG and RLI resort not to extrinsic factual evidence but to case law and treatises. We will assume for present purposes that an Illinois court would consider such materials in a case like this. See *Matter of Envirodyne Indus., Inc.*, 29 F.3d 301, 305 (7th Cir. 1994) ("It would be passing odd to forbid people to look up words in dictionaries, or to consult explanatory commentaries that, like trade usage, are in the nature of specialized dictionaries.").

In the end, though, the parties' arguments from industry usage are inconclusive. The debate revolves around the fact that the RLI Policy gave New Prime primary authority to "respond to, investigate, adjust, defend, and dispose of" claims falling within the Aggregate Corridor Deductible. AIG contends that a true deductible policy would task the insurer, not the insured—RLI, not New Prime—with claims-processing duties: only a self-insured retention would lodge them with the insured. Authority supports this distinction as a matter of industry practice. See, e.g., *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 495 (Ind. App. 2004) ("in a policy with a deductible, the insurer retains complete control of claims handling; in a policy with a retained amount, the insurer has no claims handling responsibility"); 3 Jeffrey E. Thomas et al., New Appleman on Insurance Law Library Edition § 16.09[3][b][i] (2019) ("A 'self-insured retention' (or 'SIR') is an insurance arrangement whereby the insured takes all responsibility for dealing with claims up to a certain amount of loss."). RLI responds that the Policy apportioned duties as it did because it provided only excess insurance, with New Prime serving as its own primary insurer. This view also finds

support in case law and secondary literature. See, e.g., *Royal Ins. Co. v. Process Design Assocs., Inc.*, 582 N.E.2d 1234, 1242 (Ill. App. 1991) ("the primary insurer, and not the excess carrier, has the duty to defend its insured"); Seaman & Kittredge, cited above at n.1, at 662 ("In contrast to the primary insurer, the excess insurer rarely undertakes to defend the insured.").

This debate shows only that the usages of the insurance industry do not resolve this case. As a deductible attached to excess insurance, the Aggregate Corridor Deductible was a customized term that did not mimic either a standard "deductible" or a standard "self-insured retention" in every respect. The parties were of course free to contract for nonstandard terms to suit their particular needs. See *Nation Oil Co. v. R. C. Davoust Co.*, 201 N.E.2d 260, 265 (Ill. App. 1964) ("parties to a contract may express intent contrary to a custom of the trade"); see also *Sulser v. Country Mut. Ins. Co.*, 591 N.E.2d 427, 431 (Ill. 1992) ("Parties to a contract may agree to any terms they choose unless their agreement is contrary to public policy."). Since New Prime and RLI agreed on such a customized policy feature here, one that included at least some features of both standard deductible terms and self-insured retentions, received trade usage simply does not provide a reliable guide to their agreement. Instead, we move on to other potential evidence of their mutual intent as expressed in the language of the RLI Policy.

B.  *Other Textual Arguments*

The parties also base arguments solely on the text of the RLI Policy. We address these points both to give them due consideration and to provide background for the extrinsic evidence that we find decisive here. On balance, the text offers support for RLI's view that payments toward the Aggregate

Corridor Deductible eroded policy limits, but not unambiguously so. We start with the terms most favorable to RLI.

First, RLI makes the simple point that the Policy used distinct terms for Self-Insured Retention and Aggregate Corridor Deductible. The Policy defined both "Retained Limit" and "Self-Insured Retention" without reference to the ACD.[4] It then obligated RLI to indemnify New Prime for losses "in excess of" the "Self-Insured Retention," otherwise known as the "retained limit," again without reference to the ACD. The district court reasoned that, as a result, the Self-Insured Retention and ACD were "entirely separate," and the ACD necessarily sat within RLI's policy layer. This argument has merit but we do not view it as conclusive. It ultimately depends too much on the labels alone to decide how the ACD feature works, and we rejected that path above because of other features of the policy. Cf. *Learning Curve Int'l, Inc. v. Seyfarth Shaw, LLP*, 911 N.E.2d 1073, 1079 (Ill. App. 2009) ("We determine the character of a contract from its substantive effects, not from the labels that parties prefer to place on its provisions.").

Second, RLI points to the "Defense Endorsement," which set forth the division of labor between New Prime and RLI in defending lawsuits and processing claims. The Endorsement explained that New Prime "shall have the sole and unrestricted right to settle or pay any loss for which [RLI] has no

---

[4] These two terms turn out to be synonymous: "Retained Limit" was defined in the RLI Policy to "consist of a 'self-insured retention' or required primary insurance, as indicated in the Declarations," and the Declarations indicated that no primary insurance was required under this policy. By process of elimination, the Retained Limit was simply the Self-Insured Retention.

potential responsibility … as a result of the application of the SIR and Corridor Deductible." The district court reasoned, and RLI argues, that unless ACD payments eroded policy limits, RLI had at least *potential* responsibility for every filed claim, rendering New Prime's right to defend a nullity. AIG responds that this formalistic definition of "potential" ignores numerous claims that "pose nothing but the most tenuous theoretical possibility of implicating RLI's coverage." That contention is at least plausible since RLI's coverage did not even begin until New Prime itself had spent at least $5.5 million in the policy year. The text alone does not resolve this debate about the sense of the word "potential." As we will see later, extrinsic evidence does.

Third, the district court placed "significant" weight on the RLI Policy's use of the word "aggregate" to describe the $2 million indemnity limit, reasoning that New Prime's ACD payments and RLI's indemnities sum up to "aggregate" coverage. Therefore, this argument goes, ACD payments must have reduced RLI's share. We do not find this logic convincing. RLI itself did not assert this meaning of the word "aggregate" in summary judgment briefing. The district court introduced the argument, and RLI has endorsed it on appeal. As AIG points out, however, the district court's sense of "aggregate" clashes with other parts of the policy, such as the Separation of Insureds Condition. This argument also does not settle the function of the ACD.[5]

---

[5] On this point, RLI protests that the Separation of Insureds Condition "does not use the term 'aggregate' anywhere," Appellee's Br. at 24, but it did: "nothing contained herein shall operate to increase Our total *aggregate* limit of indemnity in excess of Self-Insured Retention" (emphasis added).

Finally, on the other side, AIG's strongest textual argument is that the RLI Policy contemplated that a single occurrence could exhaust the ACD. Recall that, if ACD payments eroded the RLI Policy limit, then New Prime could spend at most the $2 million limit toward the ACD on a single occurrence and thus could not exhaust the entire $2.5 million ACD. Yet the Aggregate Corridor Deductible Endorsement expressly allowed that the ACD could be "exhausted by payment for *one or more* losses & 'costs'" (emphasis added). Another provision directed New Prime to pay all costs until the total on "*one or more* claims together equals the amount of the Annual Aggregate Corridor Deductible" (emphasis added). These two passages are not consistent with RLI's interpretation of how the ACD functions because payments toward one occurrence could not possibly exhaust the ACD of $2.5 million.

The district court held that the references to "one or more" did not introduce ambiguity into the RLI Policy because this "boiler-plate language" could not "render the policy as a whole unclear." If we were otherwise convinced that the text unequivocally provided for ACD payments to erode the policy limit, we might agree that an "isolated part" of the contract should not "determine whether an ambiguity exists." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007). But we are not convinced of the premise, especially after setting aside the inconclusive arguments regarding usage and custom. The RLI Policy left the key term in this dispute undefined, and both sides' proffered interpretations of the ACD would in effect nullify some language in the contract, which is ordinarily a result to be avoided in legal textual analysis. We therefore conclude that, as applied to the dispute here, the custom-tailored ACD feature of the RLI Policy was "obscure in meaning

through indefiniteness of expression" and hence ambiguous. *Central Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004).

IV. *Extrinsic Evidence*

Undisputed evidence of the negotiations between New Prime and RLI, and between New Prime and AIG, resolves the ambiguity in RLI's favor. As noted, Illinois courts may consider extrinsic evidence upon a finding of ambiguity. See *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Under federal procedural law, if uncontested facts clarify the meaning of a contract, an appellate court may decide the issue as a matter of law at summary judgment. See *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 587 (7th Cir. 2012) ("Even when a contract is ambiguous, as long as the extrinsic evidence bearing on the interpretation is undisputed and leads to only one reasonable interpretation, we can decide the matter on summary judgment."); see generally *Fidelity & Deposit Co. of Maryland v. Rotec Indus., Inc.*, 392 F.3d 944, 949 (7th Cir. 2004) ("in *all* cases in federal court, including diversity cases, the allocation of responsibility between judge ('law') and jury ('fact') is governed by federal rather than state law").

Although the district court here ruled only on textual grounds, the parties submitted extensive evidence and briefing regarding the history of the insurance contracts at issue. We may affirm summary judgment "on any ground that finds support in the record," so long as that ground was "adequately presented in the trial court so that the non-moving party had an opportunity to submit affidavits or other

evidence and contest the issue." *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985).[6]

Summary judgment for RLI was proper because emails and underwriting files show that New Prime, RLI, and AIG itself all intended the combined liability of New Prime and RLI to be capped at $5 million per occurrence, so that AIG's liability would begin at $5 million per occurrence, not at $7 or $7.5 million. As a matter of Illinois law and common sense, the parties' statements during negotiations and their conduct afterward carry more weight than legal interpretations offered in the run-up to litigation. See *Szafranski v. Dunston*, 34 N.E.3d 1132, 1157 (Ill. App. 2015) ("The intended meaning of ambiguous contract language may be derived from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation."). We first consider the record of negotiations prior to the *Montini* accident in March 2015—not only between New Prime and RLI but also between New Prime and AIG. Then we turn

---

[6] Dicta in some of our decisions have incorrectly suggested an additional requirement for alternate grounds for affirming summary judgment, that "the district court adequately considered them." *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019); see also *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015); *Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir. 2015); *Costello v. Grundon*, 651 F.3d 614, 637 (7th Cir. 2011); *Best v. City of Portland*, 554 F.3d 698, 702 (7th Cir. 2009). But see, e.g., *Levy v. Marion Cty. Sheriff*, 940 F.3d 1002, 1009 (7th Cir. 2019) (not requiring district court to have considered the issue). The correct rule, as stated in *Box*, 772 F.2d at 1376, is that we may affirm summary judgment for reasons not considered by the district court as long as the parties had a fair opportunity to present their arguments and evidence. See *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976) (federal appellate courts usually do not decide an issue not decided in the district court but have discretion to do so if parties had fair opportunity to be heard on the issue).

briefly to statements made during the defense of the claims at issue in this lawsuit.

A. *Negotiations Between New Prime and RLI*

To start with identified textual ambiguities, the "one or more" references that are so critical to AIG's textual arguments turn out to be mere vestiges of an earlier version of the RLI Policy. The record contains the relevant portions of policy in effect for 2012, the first year that New Prime and RLI contracted for coverage. During that year, the Aggregate Corridor Deductible was only $2 million—not $2.5 million—so New Prime would have been able to exhaust it through losses on a single claim even if ACD payments erode the policy. The ACD remained at $2 million for 2013. New Prime and RLI then agreed to increase it to $2.5 million for 2014. RLI acknowledges that it and New Prime should have revised "one or more claims" to "two or more claims" to reflect the changed arithmetic. But in interpreting the ambiguity, we will focus on New Prime and RLI's objectively expressed mutual intent, not just their drafting oversights. Cf. *Regency Commercial Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. 2007) (in case of ambiguity, "a court may consider preliminary negotiations between the parties in order to determine the meaning of contract provisions and the intent of the parties"). We suspect any lawyer or judge who has edited a legal document has had the experience of overlooking in the editing process a needed conforming change like this. AIG has presented no contrary evidence to create an issue of material fact on this point.

Extrinsic evidence also clarifies the purpose of the Defense Endorsement and its use of the word "potential," which also figures prominently in AIG's textual arguments. On

December 13, 2011, in the final days of the negotiations for the first policy year, a New Prime employee emailed the broker at Cottingham & Butler to explain why New Prime needed the Aggregate Corridor Deductible. New Prime was concerned that RLI could force it to settle claims "using our SIR dollars," in other words below $3 million where RLI had no skin in the game.[7] New Prime hence requested a "$2 M. annual aggregate deductible" so that the "combination of SIR plus the annual aggregate deductible equals the $5 M. per occurrence limit." Although we do not have RLI's response to New Prime's proposal, we know that the RLI Policy ultimately incorporated the ACD as described. In this manner, the ACD created a class of claims for which RLI had "no potential responsibility," in the sense of even theoretical possibility. The Defense Endorsement granted New Prime "the sole and unrestricted right to settle or pay" those claims. Of course, this plan would work only if New Prime's payments toward the ACD did in fact erode the RLI Policy limit.

Record evidence confirms that the 2013 version of the Policy carried forward this understanding. On November 30, 2012, RLI responded in writing to queries from Cottingham & Butler regarding the renewal of New Prime's coverage. This document described the policy as "Primary Fleet Auto

---

[7] The Third Circuit has observed that the structure of excess insurance creates the inherent conflict of interest New Prime identified: "the excess carrier [here, RLI] wishes the primary insurer [New Prime] to dispose of the case within its limits and is not unduly impressed with the primary insurer's desire to save some or all of its policy limits by a favorable verdict at trial." *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 78 (3d Cir. 1985).

Liability at $5,000,000 CSL per occurrence."[8] The responses
went on to explain that the ACD "was installed [in] Decem-
ber, 2011 to make-work an agreement with the underwriter
that PRIME would have sole control of defense and settlement
of all claims within the above layer." Far from disputing the
accuracy of this document, AIG cites two phrases from it to
try to support its own position: "$2,000,000 Limit excess a
$3,000,000 SIR + $2,000,000 Corridor Deductible" and "policy
will remain on SIR, not a Deductible." But these descriptions
merely reiterated basic aspects of the RLI Policy; they did not
contradict the clear evidence that New Prime and RLI under-
stood their collective liability to be capped at $5 million per
occurrence.

The record also contains evidence, albeit slightly less one-
sided, regarding the 2015 RLI Policy at issue in this case. In
the lead-up to renewal, RLI prepared a proposal dated De-
cember 4, 2014. The proposal said that the Aggregate Corridor
Deductible was "*in* Layer above $3,000,000 SIR" and that it
"*applies to* the $2,000,000 Limit" (emphasis added). These
phrases clearly indicate that RLI and New Prime intended the
ACD to sit within RLI's policy layer. AIG has not disputed the
authenticity of the December 4 proposal. In an email two
weeks later, on December 18, a Cottingham & Butler broker
asked RLI to "bind" the coverage "with the $2,500,000 corri-
dor per the quote attached." RLI asserted in the district court
that the referenced "quote" was the December 4 insurance
proposal, and AIG did not dispute that point.

---

[8] In the insurance business, "CSL" is an acronym for "combined single
limit." E.g., *Alshwaiyat v. American Serv. Ins. Co.*, 986 N.E.2d 182, 185 (Ill.
App. 2013).

Nevertheless, AIG argues that RLI's reply the next day to Cottingham & Butler creates a material fact dispute to preclude summary judgment. In a one-sentence summary of the policy, RLI described the indemnity limit as "above" the ACD, a word choice that conflicts with the earlier insurance proposal. Not long afterward, however, RLI returned a "Binding Confirmation" to New Prime that repeated the "in Layer above" and "applies to" language from the original quote. This exchange does not create a genuine dispute of material fact. RLI's brief reply email was at best ambiguous, and the more formal policy documents consistently made clear that ACD payments would erode policy coverage.

A final, pre-dispute account of how RLI understood the Policy comes from a December 20, 2014 memo in the underwriting file. The memo described the terms under which Swiss Re, a reinsurance company, offered to reinsure the RLI Policy assuming "a $2.5MM Corridor Deductible *within the $2MM layer* above the SIR" (emphasis added). Absent evidence to the contrary, we can assume that RLI was not lying to Swiss Re, especially given the duty of "utmost good faith" that governs reinsurance transactions. *Amerisure Mut. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 927 N.E.2d 740, 749 (Ill. App. 2010). AIG does not contend otherwise. RLI has consistently understood, and expressed its understanding, that New Prime's ACD payments reduce its own responsibility for losses, and New Prime did not disagree before this dispute arose.[9]

---

[9] One unusual feature of this case, as compared to most insurance coverage disputes, is that the insured and insurer agree about how to apply the disputed RLI Policy. The disagreement comes from excess insurers who were not parties to that policy. The several excess insurance contracts were

B.  *Negotiations Between New Prime and AIG*

The record also contains evidence that AIG knew at the time it contracted with New Prime that its responsibility for losses would begin at $5 million per occurrence. On April 2, 2014, Todd Brejcha, a broker with New Prime's agent Am-WINS, emailed Lexington to seek a quote for an excess insurance layer of "$5MM xs $5MM P." An attached "Transportation Risk Summary" described the "U/L Program" as "$5MM CSL–RLI subject to a $3MM SIR." Translating the industry jargon, Brejcha was seeking an offer to provide $5 million of coverage in excess of a $5 million primary policy. The Risk Summary explained that the underlying insurance program was RLI's $5 million combined single limit policy, $3 million of which belonged to New Prime's Self-Insured Retention. In other words, Brejcha told Lexington that New Prime sought excess coverage to begin at a $5 million per occurrence threshold.

Two weeks later, Brejcha emailed Lexington again and sent a copy of the entire 2014 RLI Policy, presumably after Lexington expressed interest in selling coverage to New Prime. Brejcha described the RLI Policy as "the main $2MM xs $3MM primary policy," thus reiterating that Lexington's responsibility would begin at $5 million. Four days later, on April 21, 2014, an AIG broker replied to Brejcha with a "$5M xs of $5M Quote" from Lexington. The attached "Quote Confirmation" listed the underlying policies as AIG understood them: a $2 million RLI combined single limit above a

---

all designed to fit together, however, and there has been no argument here to the effect that the AIG excess insurers are not entitled to contest the effect of the RLI Policy.

$3 million self-insured retention. The Quote Confirmation did not mention the Aggregate Corridor Deductible, even though Lexington had received a copy of the RLI Policy and so knew about the ACD. A week later, on April 28, 2014, Brejcha emailed the AIG broker to "bind the $5MM xs $5MM per your attached quote."

The only reasonable inference from this back-and-forth is that AIG did not believe the ACD affected the threshold at which its layer began—namely $5 million per occurrence. AIG thus understood that ACD payments eroded the RLI Policy. In the district court, AIG insisted that "no such inference exists given the plain language of the only document the Court can consider absent finding an ambiguity–the RLI Policy." We have found ambiguity, however. The extrinsic evidence of dealing between New Prime and AIG shows beyond reasonable dispute that AIG knew exactly what it bargained for in April 2014, and that's exactly where the district court's judgment left it.

C. *Later Events*

Although the evidence from before the *Herrera* and *Montini* accidents decides this case in RLI's favor, we must still consider whether later events introduce a factual dispute that precludes summary judgment. RLI can point to many additional emails among New Prime, its brokers, and RLI from April 2016 onward that endorsed RLI's interpretation of the ACD. Since the evidence from before the *Herrera* and *Montini* accidents suffices on its own, however, we see no reason to rely on after-the-fact correspondence that could be criticized as affected by strategic posturing in the dispute then brewing with AIG. We likewise decline to rely on the affidavits RLI

submitted to the district court to the extent that they are uncorroborated by documentary evidence.

We do need, however, to examine in detail a chain of correspondence from April 24, 2015. At 10:42 AM on that date, Michelle Mertz, the Risk Manager at New Prime, emailed Todd Brejcha at the AmWINS brokerage regarding the *Montini* claim. Mertz's initial view on how New Prime's insurers should share the losses tracked AIG's later position in this lawsuit: "Prime would pay the first 5.5 million ($3m per occurrence, $2.5m aggregate corridor) [and] RLI would then pay their $2m. So, as of now, $7.5m would have to be paid on this claim before it got to Lexington's layer." This email represents the first and only time either party to the RLI Policy endorsed AIG's interpretation of how the ACD functions. Notably, Mertz had become New Prime's Risk Manager in 2013, so she was not present when the RLI Policy was initially negotiated.

Less than half an hour later, Brejcha emailed the other brokers—Tim Larocca at AmWINS and Jack Welbourn at Regions—to express his disagreement with Mertz's view that "RLI will participate above the corridor deductible." Larocca then asked to see the RLI Policy himself because he recalled that "this wording is very confusing." At 11:35 AM, Welbourn wrote that, after reading the policy, he remained uncertain: "it really does not spell out the actual limit per claim." About forty-five minutes later, though, Welbourn emailed Mertz, copying the others, to explain that he "thought the limit was $5,000,000 and not $7,5000,000 [sic]," but that "the wording in the policy is a bit ambiguous." He asked Mertz to request clarification from RLI "so in the event of a loss we do not have a carrier dispute."

But as the need to write this opinion indicates, that ship had sailed. Mertz had already told Charlie Creamer, a "complex director" for AIG, that Lexington's responsibility would not begin until $7.5 million of losses. At 12:33 PM, sixteen minutes after she received the email from Welbourn, Mertz emailed Creamer to walk back her earlier position: "My description of the underlying limits is incorrect. I incorrectly stated that RLI would pay $2m on this claim over $5.5m. The RLI policy has a $5m limit so Lexington would have any amount over $5m."

The question is whether Mertz's temporary view during the morning of April 24, 2015 creates a genuine dispute as to a material fact such that a reasonable jury could return a verdict for AIG. See, e.g., *Medical Protective Co. of Fort Wayne v. American Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). We think not. Mertz's confusion, as well as the brokers' statements that the language in the RLI Policy was difficult to parse, tends to confirm what we have already held: the Policy's language was ambiguous in this respect. Mertz's erroneous statements regarding the legal effect of language she had not negotiated did not address or rebut the objective evidence from 2011 to 2014 summarized above.

To put it another way, Illinois courts clarify ambiguous contract language based on general circumstances around contract formation but only actual conduct subsequent to formation. See *Szafranski v. Dunston*, 34 N.E.3d 1132, 1157 (Ill. App. 2015). The April 24, 2015 statements from Mertz and the brokers were not conduct. All of New Prime's concrete actions, in contrast, were consistent with RLI's position in this lawsuit: Although New Prime originally advanced nearly $10 million in defense costs for the *Herrera* lawsuit, Mertz

testified in the district court that it ultimately paid only the $5 million RLI Policy limit. AIG's position would have obliged New Prime to pay $5.5 million of *Herrera* costs. New Prime's *conduct* therefore supports RLI's interpretation of the ACD. The April 24 emails do not present a genuine issue of material of fact that a jury would need to decide.

To sum up, the language of the RLI Policy is ambiguous as applied to this dispute, but the extrinsic evidence compels summary judgment in favor of RLI. On this ground, the judgment of the district court is

AFFIRMED.